[No. S058537. May 27, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
SCOTT FORREST COLLINS, Defendant and Appellant.

COUNSEL

Lynne S. Coffin and Michael J. Hersek, State Public Defenders, under appointment by the Supreme Court, and Kent Barkhurst, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CORRIGAN, J.**—A jury convicted defendant of first degree murder, robbery, and kidnapping for robbery. It found true kidnapping-murder and robbery-murder special circumstances and allegations that defendant personally used a firearm in the commission of the offenses.[1] The jury fixed the penalty at death. The trial court granted defendant's motion for a new penalty trial, after which the trial judge recused himself from further proceedings in the case. Upon appeal by the People, the Court of Appeal reversed the trial court's order granting a new penalty trial and reinstated the death penalty. Following reassignment to another trial judge, defendant's automatic application to modify the penalty verdict was denied.[2] This appeal is automatic. We affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Guilt Phase*

#### 1. *Prosecution Evidence*

Fred Rose worked for a construction business in Lancaster and drove a gray 1983 Oldsmobile Cutlass. On January 23, 1992, around 2:00 p.m., Rose told his office manager he was going to lunch. Rose usually ate lunch at one of the fast-food restaurants on Avenue "I" in Lancaster and often stopped at Bob's Liquor Store afterward for a candy bar. He normally returned to the office within 30 minutes and always phoned the office manager if he was delayed. Rose did not call and never returned.

---

[1] Penal Code sections 187, subdivision (a), 211, 209, subdivision (b), 190.2, subdivision (a)(17), 12022.5, subdivision (a). Further undesignated references are to the Penal Code unless otherwise specified.

[2] Section 190.4, subdivision (e).

At 4:05 p.m. that day, Rose's ATM card was used to withdraw $200 from the Northridge branch of the First Interstate Bank. One minute later, another withdrawal was attempted but rejected. Carolyn LeBlanc, sitting in her car outside the bank, saw defendant approach the ATM, hesitate, walk away briefly, and then return. LeBlanc identified defendant from a photographic lineup.

That evening, residents in the area of Clybourn Avenue and Chandler Boulevard in North Hollywood heard gunshots. Clybourn Avenue intersected Chandler Boulevard at a dead end. Hedges on Chandler obscured railroad tracks that ran parallel to the street. Between 6:00 and 6:30 p.m., John Kirby and Robert Chandler heard two shots about five seconds apart and walked outside. Linda Ryan heard the two shots between 6:20 and 6:30 p.m. and looked out her window. Kirby said the shots came from the direction of Chandler. He saw a car pull away from the curb and all three witnesses saw the car drive west on Chandler with its lights off. Kirby and Ryan believed the car was silver or gray, and both identified a photograph of Rose's Oldsmobile as similar to the car they saw. Chandler tried unsuccessfully to read the car's license plate. He saw the driver in silhouette, but saw no one else in the car.

Around 8:45 p.m., Richard Hamar was jogging east on the railroad tracks along Chandler. He saw Rose, making gurgling sounds, lying next to the tracks. Hamar thought Rose was drunk and did not stop. Rose was still there when Hamar returned 20 minutes later. When Hamar saw that Rose was lying in a pool of blood, he called 911. Firefighters arrived a short time later, followed by paramedics and police. Rose had a gunshot wound to the head and was airlifted to the hospital. The next day he was taken off life support and pronounced dead.

At 9:30 p.m. on the night of the shooting, defendant used Rose's Chevron credit card to buy gas in North Hollywood. The station, on Moorpark Street, was about two miles from the murder scene and 0.9 miles from defendant's previous residence on Cahuenga Boulevard. Defendant tried to buy beer and produced identification at the clerk's request. However, he abandoned the purchase when the clerk began to write down his identification information. The clerk later identified defendant from a photographic lineup. The police obtained the Chevron credit card receipt.

Los Angeles Police Detective Jesse Castillo arrived at the location of the shooting around 11:00 p.m., after Rose had been taken to the hospital. Castillo searched for weapons and bullets, but found none. There was no trail of blood from the street, which led Castillo to conclude the victim had been shot at the scene rather than shot elsewhere and dragged to the location.

Castillo saw shoe prints near the blood pool where the victim had been lying. He noted their location on a chart at trial. To the east of the blood pool were two shoe prints made by the boots of emergency personnel. There were many other overlapping and trampled shoe prints that Castillo "could not make heads or tails out of" except to identify them as belonging to emergency personnel.[3] Castillo saw five shoe prints on the west side of the pool of blood. One print had been made by the jogger.

The various shoe prints were photographed. Criminalist Ronald Raquel compared the depicted impressions to the soles of a pair of size 13 Nike Driving Force shoes taken from defendant. Raquel concluded that certain photographs contained impressions matching the pattern of defendant's shoes. Raquel believed the impressions were made by a shoe sized between 12½ and 13½, but could not be more precise because no photograph depicted an entire heel-to-toe impression. As a result, Raquel testified that although he could not be certain, it was his "educated opinion" that defendant's shoes made the impressions.

A patent and inventions manager for Nike Corporation examined the photographs of the shoe prints from the crime scene. He believed the prints were made by a size 13 shoe, although the size could have ranged from 12½ to 13½. The depicted pattern was used on Nike shoes made between 1988 and 1991.

Detective Castillo testified that the Nike shoe impressions were found at two points west of the body. On direct examination Castillo described these locations as a "few feet" from the pool of blood. He testified on cross-examination, however, that the Nike impressions were about 15 feet away. A firefighter's shoe print overlapped one of the Nike impressions.[4]

Dr. William Sherry supervised Rose's autopsy. Rose died from a gunshot wound to the head. The bullet entered the upper right rear of the head and exited through the right forehead. Dr. Sherry opined that the wound was caused by a medium caliber bullet, more likely from a revolver than an automatic. A .38-special is a typical medium caliber bullet.

Defendant's mother, Mary Collins, testified that she and defendant lived in Palmdale. Around 11:00 a.m. on the day of the shooting, she drove defendant

---

[3] A responding firefighter testified that once paramedics arrived, there were four to six emergency personnel attending to Rose at the scene.

[4] Castillo testified that as to the two locations of the Nike prints, one was a "little bit closer" to the blood pool than 15 feet. However, he clarified in a declaration accompanying defendant's new trial motion that the second location was actually "a bit further" than 15 feet.

to Lancaster, dropping him near Avenue "I." In 1986, Mrs. Collins and defendant lived on Cahuenga Boulevard in North Hollywood. Detective Castillo testified that the distance between defendant's former home and the murder scene is 1.2 miles.

Around 11:00 p.m. on the night of the crime, defendant arrived in Bakersfield at the home of Olga and Tony Munoz, where his girlfriend Maria Gutierrez was staying. He spent the night. The next day defendant and Gutierrez bought beer and went to the nearby home of Gutierrez's cousin, Dagoberta Amaya. Other young people began gathering in the backyard during the afternoon. Defendant made several more trips to the market to buy beer, and the drinking continued into the evening. Amaya gave defendant a black hooded jacket to wear.

The events of the evening of January 24, 1992, were related by five witnesses: Amaya, Michael Hernandez, Lorenzo Santana, Sergio Zamora and David Camacho. At the time of trial, nearly two years after the offense, Amaya was 20 years old and on felony probation. Hernandez and Santana were 18 and 16 years old, and incarcerated at the California Youth Authority (now Division of Juvenile Justice). Zamora and Camacho were 17 years old and on probation. Hernandez, Zamora, and Santana were Varrio Bakers gang members. Camacho was not a gang member. Amaya was no longer in the gang at the time of trial.

Amaya testified that Rose's Oldsmobile was parked across the street from his house on January 24, 1992. Defendant said he had stolen the car to get to Bakersfield. Defendant showed Amaya a bank card and a Chevron credit card. Amaya recalled the name on the cards as similar to "Fred Jose." Defendant showed a .38-caliber gun to some of the young men who had come to Amaya's house that afternoon. Santana recalled that Amaya retrieved the gun from beneath some boards while defendant stood next to him. Defendant explained that the gun was "messed up." Santana overheard defendant brag to Larry Castro "something about the murder and the gun he had." Santana told police that he also heard defendant tell Castro he "got the guy at a liquor store." Hernandez heard defendant say that the gun "had a murder rap on it."

At some point after the gun was displayed, Santana, Hernandez, Castro and a fourth person called "Veterano" left the gathering in the Oldsmobile to commit a burglary. Hernandez saw Castro with a gun, which he assumed was the .38-caliber shown at Amaya's house. The four returned to Amaya's house afterward.

Later that evening, Amaya was drunk. He obtained defendant's gun but did not recall how. He and his girlfriend argued and Amaya put the gun to his head. Defendant grabbed the gun, emptied the bullets and put them in his pocket.

Sometime thereafter, defendant, Hernandez, Santana, Zamora, Camacho and Richard Smith rode in the Oldsmobile to the neighborhood of the Colonia gang. As they entered the Colonia neighborhood, someone threw bricks at the car. Hernandez then drove to a nearby field where defendant test fired the .38-caliber gun. Defendant got a nail from the car and placed it under the barrel to make the gun fire. Hernandez drove back to the Colonia area with defendant in the right front passenger seat. Defendant fired at two men, but hit neither. Although he tried to fire several times, the gun discharged only once or twice.

Around 9:00 p.m., Kern County Deputy Sheriff Francis Moore received a dispatch about the Oldsmobile, saw the car and began following it. Hernandez panicked and sped away. Defendant told Hernandez to drive faster. During the chase, defendant threw several items out of the car, including the gun and bullets.

Hernandez crashed into a fence. Camacho heard defendant say he was "going to the county because he had the murder up in L.A." Hernandez and Santana heard defendant say that the car had a "murder rap" on it. Zamora testified that during the police pursuit, defendant said that he had kidnapped a guy, taken him to the bank for money, and then shot him. Zamora also said that defendant claimed he shot the victim in the head, but Zamora could not recall whether defendant made this statement during the police pursuit or at Amaya's house.

Defendant and the other five occupants were arrested. In the Oldsmobile there was a knife on the front floorboard and Rose's wallet was in the glove compartment. The car keys, Rose's ATM card, a live .38-caliber round and an empty shell casing were recovered from the ground beside the right front passenger seat. Moore checked the pursuit route and found a .38-caliber revolver with a broken hammer. A live .38-caliber round was next to the gun. The gun contained two casings that had been fired and two that misfired.

Two live .38-caliber rounds were found in defendant's pants pocket and another live round in his jacket. Defendant had $100 in his wallet. The next day, Amaya found the Chevron credit card in his yard and directed his younger brother to burn it.

Around 5:00 a.m. on January 25, 1992, Detective Castillo met with defendant. The other occupants of the car had been interviewed. Defendant

waived his rights under *Miranda*[5] and agreed to speak. He denied having been in the car during the driveby shooting. He accepted a ride in the car to go to the store, and Zamora was the only occupant he recognized. Defendant did not know the car was stolen. He believed the car was pulled over by police because the driver was drunk. Defendant threw his bottle of beer and trash out the window, but denied throwing a gun or bullets. He said the jacket he was wearing did not belong to him. He opened the glove box at one point to get a pen and saw a wallet, which he assumed belonged to the driver. When Castillo accused defendant of murdering a man to get the car and wallet, defendant repeated that he had only been in the car for 10 minutes. In response to questions by Castillo, defendant claimed he had not been to North Hollywood in the past three and a half years and had been in Los Angeles only once. He told Castillo that about 10 years before, he had lived at 4847 Cahuenga Boulevard in North Hollywood.

Detective Castillo interviewed defendant again on Monday, January 27. At that time, Castillo knew that defendant had used Rose's ATM card in Northridge and the Chevron credit card in North Hollywood. Defendant had written the name "Scott Rolse" on the Chevron receipt. Defendant said his earlier statements to Castillo were correct and again denied any involvement in the murder. Asked for handwriting exemplars, defendant wrote his own signature. Castillo then asked defendant to write the name "Scott Rose," purposefully changing the name defendant used on the Chevron receipt. Defendant refused.

Detective Castillo asked defendant to talk to him about the day of the murder. Defendant said his mother dropped him off in Lancaster near Avenue "I," and gave him $50. He picked up odd jobs at construction sites and earned $45 more. He got a ride with a "construction guy" to Mojave, hitchhiked to Bakersfield and spent the night with Maria Gutierrez. The Oldsmobile was already in Bakersfield when he arrived. Early the next afternoon he went to the home of Gutierrez's cousin where he drank beer with a group of people until around 7:00 p.m., when they gave him money to go buy more beer. A car drove by and defendant recognized one of the passengers. They gave him a ride, but were chased by the police and crashed into a fence.

Defendant again refused to sign the name "Scott Rose." Castillo then showed defendant an enlarged version of the signed Chevron receipt. Defendant appeared frightened, but insisted it was not his signature. After Castillo told defendant that he had been identified in a photographic lineup and accused him of killing Rose, defendant said, "I'll tell you."

[5] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

Defendant said he was walking along the Sierra Highway in Lancaster. He was looking inside cars and saw the keys in the Oldsmobile. He "jumped in and took it." The gun was in the car. He looked in the glove compartment and found the gun, wallet and credit cards. Defendant admitted using the ATM card, claiming that it had the personal identification number (PIN) on it. While at the ATM he wore a hard hat that he found in the car because he knew he would be photographed. Defendant said he needed the money for liquor and wanted to go to East Los Angeles. He admitted purchasing gas at the Chevron station.

While he was awaiting trial, jail officials intercepted a letter written by defendant. The letter referred to "ratas" from the Varrio Bakers gang and asked a "Mr. Woody" to "put palabres to the calles to put in check" Hernandez, Zamora, Camacho, Santana and Amaya. Except for Amaya's, the names and addresses of the young men were attached to the letter.

A Los Angeles County sheriff's deputy familiar with gang terminology explained that "ratas" refers to snitches and the phrase "put palabra to the calles" means to put the word out on the street. He testified that "to put in check" means to intimidate someone to keep him from testifying, and could involve a verbal warning, a beating, a stabbing, or killing.

### 2. *Defense Evidence*

Defendant admitted that he had been convicted of armed robbery, assaults and possession of narcotics and had been to prison.[6] He testified that on January 23, 1992, between 10:30 and 11:00 a.m., his mother drove him to Lancaster so he could look for work. He walked along Avenue "I," inquiring unsuccessfully at fast-food restaurants. Around 1:30 or 2:00 p.m. he decided to hitchhike home to Palmdale. As he walked out of town on the Sierra Highway, he saw Rose's automobile parked on the side of the road. The keys were inside. Defendant had just gotten out of prison and his "values were not too straight as far as staying clean." He wanted to use the car to go to Los Angeles so he unlocked the car through a slightly open rear window. He drove toward Reseda to see a friend. On the way he bought gas with money that his mother had given him for clothes. At the gas station he searched the car and found a wallet with credit cards and an ATM card in Fred Rose's name. He also found a card with the name of the bank and Rose's PIN. Defendant continued driving toward Reseda. En route he used Rose's ATM card to withdraw $200 and tried unsuccessfully to make a second withdrawal.

---

[6] Defendant's age was never established in the guilt phase. Defendant's mother testified at the penalty phase that he was born on June 26, 1970, making him 21 years old at the time of the murder.

Failing to locate his friend in Reseda, defendant decided to surprise Silvia Gomez, whom he had not seen since he went to prison. He drove to East Los Angeles, arriving at the home of Gomez's mother between 5:30 and 6:00 p.m. Gomez's boyfriend, Joe Valle, and her children were there. Gomez was going to a party so defendant left around 8:00 p.m., intending to drive to Bakersfield.

After stopping at a McDonald's in Hollywood, defendant purchased gas with Rose's Chevron credit card and tried to buy beer but changed his mind when the cashier asked for identification. Arriving in Bakersfield about 11:00 p.m., he stayed with his girlfriend Maria Gutierrez at the home of Tony and Olga Munoz.

Defendant used Rose's ATM card again the next morning. Around noon, he bought beer and drank with Sergio Zamora. He phoned his mother and told her he had hitchhiked to Bakersfield with money he earned from construction work. He bought more beer and went to Dagoberta Amaya's house, where he drank with Amaya, Gutierrez and Zamora. During the afternoon, groups of Amaya's "homeboys" came and went. Defendant twice went to the market for more beer.

Around 6:00 p.m., after his last trip to the market, defendant told Amaya that he had stolen the Oldsmobile in Los Angeles. Bystanders heard him. Larry Castro suggested they go for a "cruise" in the car and said he had a gun. Amaya retrieved Castro's gun from behind some boards and showed it to defendant and others. Someone mentioned that the gun was "messed up." Defendant bought the gun. Castro said he wanted to go "do some stuff," which defendant understood to be a robbery. Defendant let Castro take the gun and the car. Castro and others from the party were gone about an hour and returned with items they had stolen.

Around this time, Amaya argued with his girlfriend and pointed the .38-caliber gun at his own head. Defendant grabbed the weapon, emptied the bullets, and put them in his pocket. Amaya's girlfriend fled. Defendant gave the gun to Hernandez and ran after Amaya's girlfriend, catching up with her several blocks away. As they returned to Amaya's house, a group of juveniles drove up in the Oldsmobile. Defendant got in the car because he wanted to go buy more beer. They drove to a market where they encountered another group of Varrio Bakers members in a blue car. The two groups drank beer together for about 15 minutes before someone suggested they go "box with the Colonia." The two cars drove to the Colonia neighborhood, with the blue car in front. Hernandez drove the Oldsmobile with Zamora and defendant in the front seat.

In the Colonia neighborhood, someone threw bricks at them. The two groups then drove to a nearby field, where Hernandez gave defendant the gun and some bullets. Defendant and a man from the blue car, whom defendant described as a "black cholo," loaded the gun. Defendant test fired it, placing a nail under the barrel. Defendant gave the gun to the cholo, who wanted to shoot at the Colonia members. Defendant then got in the blue car and the cholo got in the Oldsmobile. Back in the Colonia neighborhood, the cholo fired two shots from the Oldsmobile. Both cars fled, meeting in an alley a few blocks away. Defendant retrieved the gun and the two men switched cars. The police started chasing the Oldsmobile. Hernandez panicked. Defendant told him to keep driving because defendant was on parole and did not want to get caught with a gun. Defendant threw the gun and bullets from the window. He did not tell the others that the car had been involved in a murder. The car crashed into a fence. Defendant heard police yell that the car had been used in a murder in Los Angeles.

Defendant testified that before Detective Castillo recorded the first interview, he told defendant, "[T]he guy got shot and robbed for his car. We think you did it." Castillo asked for information about defendant's girlfriend, Maria Gutierrez, and said that he wanted "to pull her in too." Castillo then turned on the tape recorder and read defendant his rights. Nothing defendant told the police during the first interview was true.

Defendant was reinterviewed two days later. Although he initially intended to tell the truth, he became angry, changed his mind, and lied again during the second interview. He refused to sign the name "Rose" when he gave the handwriting sample because he knew he had signed the Chevron credit card slip.

After the second interview, defendant spoke with various potential witnesses. He called Zamora after Detective Castillo told him the juveniles in Bakersfield had implicated him. Defendant threatened to "mess [Zamora] up" if the juveniles did not tell the truth. Defendant called Gutierrez and warned her to stay away from the police for 10 to 15 days. He contacted Silvia Gomez and told her he might need her as a witness and to tell the truth. He tried to contact Joe Valle several times, but never spoke to him.

Defendant admitted writing the letter from jail introduced by the prosecution. He wrote the letter to his friend Daniel Graciano, who was in prison. He wanted Graciano to "get in touch with anybody from Varrio Baker where he was housed at and have them get in touch with their people on the street to talk to these guys." Defendant wanted someone to tell the juveniles to stop lying.

Defendant's friend Silvia Gomez testified that defendant visited her on January 23, 1992, unexpectedly arriving around 5 or 5:30 p.m. He left shortly before she departed for a party about 8:45 or 9:00 p.m. On cross-examination, Gomez said defendant called her from jail "about three days later," which she agreed was Sunday, and told her the murder for which he had been arrested was supposed to have occurred when he was at her house.

Gomez's boyfriend, Joe Valle, testified that defendant arrived around 6:30 or 7:00 p.m. and stayed for about an hour. When interviewed by defense counsel, Valle thought defendant's visit happened in summer. After talking with Gomez, he remembered the date as January 23, about the time of the Super Bowl. That was the only time Valle met defendant. Before the trial, he spoke by telephone with defendant three or four times.

Ronald Delgado saw defendant at a McDonald's in Hollywood around 8:30 p.m. the evening of the shooting.

Jessie Cepeda's home was the site of a driveby shooting on January 24, 1992. A gray Buick Regal and a blue Chevy Nova had been parked outside, then drove away and returned about 10 minutes later. A man in the gray car said "Varrio Bakers" and shot toward the door three times. Cepeda's grandson, Jaime Garcia, and his cousin, Gabriel Cabrera, were outside. Ms. Cepeda did not see the face of the shooter, who wore something black on his head. Cabrera yelled the shooter was "Spooky," a Black Hispanic gang member known to commit driveby shootings in the neighborhood. Ms. Cepeda has never seen "Spooky" and did not know if he fired the shots.

A sheriff's deputy interviewed Garcia and Cabrera. Garcia said two cars pulled up in front of the house. One was blue and the other was brown, spotted with gray primer. A Hispanic man handed the gun to a Black male who leaned out of the blue car and fired shots. Garcia said the shooter was possibly a man he knew as "Spooky."

### 3. *Rebuttal*

Detective Castillo investigated defendant's alibi. Silvia Gomez said she noted defendant's visit on a calendar, which she could not find. She said she would contact Castillo if she did so. When Castillo telephoned about an hour after the interview, Gomez told him she needed a lawyer and would not speak to him. Castillo called again, but Gomez refused to talk to him.

Detective Castillo contacted Joe Valle who told him he had nothing to say to the police. A month earlier, Valle had missed a meeting with another officer.

The prosecutor directed Detective Castillo to Gomez's testimony in which she claimed that defendant telephoned her on the Sunday following his visit and told her the murder occurred while he was at her house. Castillo testified he never told defendant the time of the murder. The earliest point at which defendant could have learned of the time of the murder was January 28, when police reports were provided to him at his arraignment.

The distance between the location where Rose's body was found and Silvia Gomez's home was 14.2 miles. It took Detective Castillo 18 minutes to drive the route. Castillo also drove to the McDonald's where defendant said he ate on the night of the murder. There were three highly visible Chevron stations along this route, including one very near the McDonald's.

B. *Penalty Phase*

1. *Prosecution Evidence*

a. *Victim Impact Testimony*

Sharon Rose testified that she and Fred Rose had been married for 21 years and had three children. Fred Rose was 42 years old when he was killed. After his death, Mrs. Rose moved out of state to avoid proximity with the crime scenes. She described her husband as a wonderful person who loved his family. She still felt the pain of losing him, and the family continued to receive grief counseling. The children had difficulty in school after their father's murder. The victim's mother and children also testified about the impact of his murder.

b. *Other Crimes Evidence*

Around 9:00 p.m. on April 20, 1986, Fred Joseph was in the parking lot of his market in North Hollywood, walking toward the trash cans. Young men in two cars drove into the lot and jumped out. Fearing attack, Joseph ran inside and called the police. When Joseph later came outside to talk with the police, he saw that a large area near the trash cans had been burned, and a broken glass bottle was on the ground. Joseph believed defendant was among the young men who had been in the lot because three weeks earlier Joseph told defendant to leave the market following complaints that he was harassing customers.

Also on April 20 around 9:00 p.m., Lisa Nevolo was sitting in her car near Joseph's market. She saw defendant and other juveniles arrive and get out of a car. Defendant stood about a foot away from her driver's side window holding a glass bottle with fluid and a rag stuck in the top, which Nevolo

described as a Molotov cocktail. He had a tire iron in the other hand. Defendant waited about 15 minutes and then ran out of sight. Nevolo saw a large flash and thought the nearby apartment building was on fire. Defendant ran back past her car, his hands empty. He and another juvenile jumped into a waiting car. Los Angeles Police Sergeant John Mosley responded to the parking lot of Joseph's market. He recovered a glass bottle fragment with a rag inside from the burned area of the parking lot. He opined that the item was a Molotov cocktail and that it had caused the fire.

On June 9, 1988, John Hall was sitting in his pickup truck in Canoga Park. He saw defendant and another man tampering with a van belonging to Hall's friend. When Hall called out to them, they fled. A short time later, Hall heard someone yell and saw defendant and another man running from a nearby convenience store. Hall jumped out of his truck and tried to grab defendant. During the struggle, Hall felt something in his back and realized defendant had a knife. Hall released defendant, who fled. An officer responding to a report of an assault met with Hall and saw that he was bleeding from a laceration on his back. While interviewing Hall, the officer received a radio broadcast of a robbery at the convenience store. The suspect matched Hall's description of his assailant. The officer located defendant hiding in the bushes a block from the store. Hall identified defendant as the person who had assaulted him.

On January 13, 1989, South Gate Police Officer David Dattola responded to a possible gang fight outside the local high school. Defendant was waving his arms and screaming profanities at another man. As Dattola approached, the two separated and started to leave. Dattola, who was wearing a black jacket with the word "police" on it, told defendant to stop and put his hands up. Defendant repeatedly refused and yelled a profanity at the officer. After he was arrested, an open pocketknife was recovered from his pants pocket.

On April 6, 1989, 15-year-old Will Taylor, who is African-American, waited at the bus stop after school. His friend James Richardson had gone into a 7-Eleven store. Defendant, armed with a knife, followed Richardson out of the store. Richardson threw a drink at defendant, who stumbled and fell. Richardson ran toward Taylor. Defendant got up, took his shirt off and said something about "Watts." Defendant walked toward the teens, holding the knife and yelling racial slurs.

Off-duty Police Officer William Tatum drove by and saw defendant swinging a knife at two younger boys who were backing away. Tatum yelled to defendant to leave the boys alone, but defendant continued swinging the knife. Tatum then pointed his gun out the car window and told defendant to stop, but defendant ignored him. Tatum got out of the car holding his gun and

identified himself as a police officer. Defendant fled. Tatum flagged down a motorcycle officer who arrested defendant 10 minutes later and searched him, but found no weapons. A police officer with the gang unit transported defendant to the police station. During booking, defendant taunted the officer that the knife would not be found.

In 1992, while awaiting trial on the murder charge, defendant was housed in the county jail. In May 1992, Armando Gonzales was serving a jail sentence for driving under the influence. Gonzales bought a pair of shoes from another inmate and put them under his bunk in the jail dormitory. Later that evening, defendant, who was in the bunk next to him, told another inmate to take the shoes. Defendant then approached Gonzales and demanded his money. Defendant shoved Gonzales and grabbed the money from his pocket. He warned Gonzales not to say anything or he would "get his butt kicked." The following day Gonzales was moved to another dormitory at his request. He woke from a nap to see defendant in a nearby bed. That night, defendant asked Gonzales why he had changed dormitories and told Gonzales that he would have to start paying defendant "rent." Defendant held a razor blade in his hand, and told Gonzales that he ought to "shank" him, but would not do so if Gonzales paid rent. Gonzales was very afraid. He asked to be moved away from defendant and said he feared for his life. Defendant was moved to administrative segregation.

On April 18, 1993, Los Angeles County Deputy Sheriff Robert Peacock tried to interview defendant about a reported incident. Defendant refused to provide any information. He began yelling into the dormitory that he was being harassed, appearing to want to start a disturbance. Inmates yelled back. Defendant challenged Peacock and said he would show him "who the tough guy is." As Peacock tried to restrain him, defendant turned and kicked Peacock in the shins. Another deputy arrived. Defendant continued screaming to other inmates in the dormitory and kicked at the deputies until they subdued him.

As to defendant's robbery conviction, Sandra Trujillo testified that on December 3, 1988, about 6:30 p.m., she was in her car behind a video store in North Hollywood. Defendant approached, tapped on her car window and made a motion as if he wanted to know the time. He then pointed a gun at Trujillo and told her to get out of the car. After Trujillo complied, defendant told her, "You start running bitch, or I'm going to kill you." Defendant drove away in the car.

### 2. *Defense Evidence*

Defendant's mother, Mary Collins, testified that defendant was two years old when his father died. At five years old, defendant was diagnosed as

borderline hyperkinetic and given Ritalin, but his condition did not improve. Defendant's first contact with the juvenile justice system occurred after he burglarized an elementary school when he was about 13 years old. His behavior worsened. After a theft incident, defendant was given counseling, but his activities escalated and he became involved in gangs. He committed a residential burglary when he was about 15 years old and there were other "episodes" that year as well. Following the Molotov cocktail incident in April 1986, defendant was referred to the California Youth Authority (CYA) for a diagnostic report. He turned 16 years old that June. Mrs. Collins wrote to the juvenile court judge and asked him to consider a school in Florida as an alternative placement. Defendant enrolled there, but Mrs. Collins brought him home after only three months because she disagreed with the school's use of antidepressants for treatment.

After his return to California, defendant's mother suspected he was using drugs. Between mid-1987 and early 1988, defendant was confined at Mira Loma Camp, run by the CYA. Returning home, he became involved in gangs. In 1988, he sustained a serious head wound in a gang fight. On the day defendant robbed Sandra Trujillo, he was also arrested for possession of phencyclidine. As a result of these events, he was imprisoned from May 1989 to December 23, 1991.

In 1986, Joe Kraics, a casework specialist for the CYA, prepared a diagnostic report to help the juvenile court determine defendant's placement. The report concluded defendant was an immature 16 year old, involved in gangs and drugs. Defendant had a troubled relationship with his mother who protected him rather than acknowledging his delinquency. He had poor impulse control and fought frequently.

Dr. Susan Fukushima, a psychiatrist with the CYA, also examined defendant in 1986. She concluded he had adolescent conduct disorder, attention deficit disorder, and a mixed personality disorder. Defendant's dependence on his mother and the absence of a male figure in the household hampered his ability to mature and establish a male identity. Gang involvement gave him peer support and male role models. Dr. Fukushima recommended that defendant enter a structured long-term treatment program.

James Park was a prison consultant who had spent 41 years working in corrections, including 31 years with the California prison system. During his career he had made classification decisions on 15,000 inmates. Someone sentenced to life without possibility of parole is assigned to a level four maximum security prison. Park opined, based on prison and county jail records, that defendant could be safely housed in a level four prison. Park testified that most prisoners "begin to mellow out" after the age of 25.

### 3. *Rebuttal Evidence*

John Iniguez was the acting chief of classification at the California Department of Corrections (now the Department of Corrections and Rehabilitation). He testified that inmates entering the prison system had become younger, more violent and more gang-oriented than in the past, and took longer to settle down. Iniguez opined that, based on defendant's past incarceration history, his violent and predatory behavior would escalate and defendant would be a threat to staff and other inmates.

## II. DISCUSSION

### A. *Guilt Phase Issues*

#### 1. *Denial of Motion for Mistrial*

Defendant moved for a mistrial after the prosecutor elicited allegedly inadmissible testimony from witness Maria Gutierrez. He asserts the trial court's denial of the motion violated his rights to due process and a fair trial under the federal and state constitutions and unspecified statutory law. (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, §§ 15, 16 & 17.) His claim is without merit.

Defendant had moved in limine that Gutierrez be instructed not to mention defendant's recent incarceration. Defendant and Gutierrez met while he was in prison in Susanville. He was released from that facility on December 23, 1991, a month before Rose's murder. When the prosecutor responded that she did not intend to ask how Gutierrez and defendant met, the court ruled the motion was moot. The court added: "[I]t's understood that there's to be no reference to the subject matter without first obtaining the permission of the court."

During her redirect examination, Gutierrez testified that defendant called her about a week after his arrest and told her to tell police that he had been with her "the whole time" and that Gutierrez had not seen a gun or a credit card. On recross-examination, Gutierrez acknowledged speaking to the police on January 30, 1992, but could not recall if she told them about defendant's phone call. On further redirect examination, Gutierrez testified that she told Detective Castillo that defendant had been trying to call her "ever since he was arrested." Gutierrez could not accept his calls because she lacked the money to pay for them, but on one occasion defendant was able to speak to her.

On further recross-examination, defense counsel established that Gutierrez had accumulated a $1200 phone bill while living at the Munoz residence.

Defense counsel asked, "So the subject matter of telephone calls was a little sensitive around the house?" When Gutierrez agreed, defense counsel confirmed with Gutierrez that she had not accepted defendant's calls following his arrest. Defense counsel then asked, "[Y]ou didn't tell the police about the one call you now say happened before meeting with them, is that right?" Gutierrez answered that she told the police about this phone call and that defendant dialed directly on that occasion.

On further redirect, the following colloquy occurred between the prosecutor and Gutierrez:

"Q. [Ms. Gutierrez], this $1200 bill that you ran up, how did you run up a $1200 phone bill?

"A. He would call every night collect and he was in Susanville.

"Q. So now how much would each one of these calls be?

"A. A lot . . . .

"Q. This was in a period of one month that you built up a $1200 collect phone bill?

"A. No. This was when he was still in Susanville before he got out in December.

"Q. How long a period of time did this $1200 bill encompass?

"A. About three months."

The prosecutor asked no further questions and the jury was excused for the day. Defense counsel immediately moved for a mistrial "based upon the response of the witness indicating not only that the defendant was in Susanville, but that he was released in December preceding these events." The prosecutor responded that Gutierrez did not say "released" and doubted jurors knew that Susanville was a prison. The prosecutor stated, "I don't know—I quickly stopped any questioning. I did not realize that was going to be her response and it was certainly not something that I had brought up." She noted that defense counsel had initiated questions about the phone bill.

The trial court stated: "I'm really rather concerned with a series of things that have happened. And I'm not suggesting that they were done with any bad motive, but it is happening enough that I want to avoid it in the future." The court observed that the issue of the phone bill was "predictably sensitive."

The prosecutor reiterated that defense counsel raised the issue and asked whether the court expected her to leave it "hanging up in the air." The court responded, "No, I don't expect you to do that. But I would like to be alerted that these phone calls were from Susanville. I certainly had no idea where the phone calls came from. And had I known that I would have called [a sidebar] conference and I would have avoided it." Nevertheless, the court concluded, "I don't see this is so prejudicial that it calls for a mistrial. I will deny the motion." Defense counsel said nothing further on the issue.

The next day the trial court expressed concern that it should have given a limiting instruction regarding Gutierrez's references to Susanville and stated that it would, if requested, strike that portion of the witness's testimony. The court invited defense counsel to propose a limiting instruction. Although defense counsel initially advised he would do so, defense counsel later declined for fear of highlighting the challenged testimony. He explained that, for the same reason, he had not requested a limiting instruction the previous day when he made his motion.

■ Defendant claims the mistrial should have been granted because the prosecutor committed misconduct by improperly eliciting Gutierrez's testimony. Defendant has forfeited this claim. " '[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' " (*People v. Stanley* (2006) 39 Cal.4th 913, 952 [47 Cal.Rptr.3d 420, 140 P.3d 736].) When defendant eventually moved for a mistrial at the conclusion of Gutierrez's testimony, he did so only on the basis of "the response of the witness." He did not argue that the prosecutor had improperly elicited the challenged responses. Additionally, defendant rejected the trial court's offer to admonish the jury. In any event, there was no misconduct. The defense chose to pursue the subject of the collect telephone calls and their cost. The prosecutor's redirect was permissible. Gutierrez nonresponsively volunteered that defendant's calls were made "before he got out in December."

■ The court did not abuse its discretion in denying the motion for a mistrial. "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" (*People v. Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776].) A motion for a mistrial should be granted when " ' "a [defendant's] chances of receiving a fair trial have been irreparably damaged." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 282 [96 Cal.Rptr.2d

682, 1 P.3d 3].) Here, Gutierrez's volunteered remarks regarding defendant's phone calls were brief and ambiguous. The court did not abuse its discretion in concluding that any prejudicial effect could by cured by an admonition.

Further, we note that as part of defendant's trial strategy, he later established his criminal history and recent incarceration through his own testimony. He claimed he took the victim's car because he had recently been released from prison and his values were poor. Defendant admitted that he threw the gun and ammunition from the car during the police chase and chose to explain that conduct by acknowledging that he was on parole and did not want to get caught with a gun. Defendant asserts that this evidence came in after Gutierrez's testimony and the trial might have proceeded differently but for her remarks. Given the limited nature of those remarks, however, his argument is not persuasive.

### 2. *Asserted* Doyle *Error*

Defendant contends the prosecutor committed error under *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240] (*Doyle*), during her cross-examination of defendant and in her guilt phase argument. Specifically, defendant complains the prosecutor improperly questioned his failure to inform the police or prosecutor of his alibi before trial.

#### a. *Background*

At trial, defendant presented an alibi defense that he had never mentioned during his several statements to Detective Castillo. According to testimony, Fred Rose was shot between 6:00 and 6:30 p.m. on January 23, 1992. Defendant testified that after using Rose's ATM card on that date, he tried unsuccessfully to locate a friend in Reseda, and then drove to East Los Angeles to visit Silvia Gomez. He arrived at the home of Gomez's mother about 6:00 p.m. and stayed until 8:00 p.m. He then drove through Los Angeles and Hollywood before continuing to Bakersfield.

In his interviews with Detective Castillo, defendant never mentioned his visit with Silvia Gomez. After waiving his *Miranda* rights, defendant was interviewed twice. Defendant testified that "everything" in his first interview was false and stated, "I would have told them the moon was blue to throw them on a wild goose chase." He told Castillo he got in Rose's car for the first time in Bakersfield and spent no more than 10 minutes in it. Defendant claimed he had not been to North Hollywood for three and a half years.

Defendant admitted that he lied in the second interview as well. He testified he was going to tell the officers the truth, but changed his mind. He

stated: "I said the hell with them. Let these bastards do their own home-work." He initially told Detective Castillo that his mother dropped him off in Lancaster where he worked at construction sites until about 4:00 p.m. After eating at McDonald's, he got a ride from a construction worker to Mojave and hitchhiked from there to Bakersfield, arriving that night.

After Detective Castillo confronted defendant with the Chevron credit card receipt and said he had been identified in a photographic lineup, defendant gave yet another explanation of events. In this version, defendant, while walking out of Lancaster on the Sierra Highway, saw the Oldsmobile with the keys inside and took it. He found the gun, wallet and credit cards in the car. He stopped at the ATM for money and "wanted to go to East L.A." to "visit some of my homeboys."

Defendant testified that he did not know he had an alibi until he later learned when Rose was shot.

Defendant claims that in certain exchanges during cross-examination, the prosecutor improperly used his post-*Miranda* silence to impeach his alibi. He points to several exchanges with the prosecutor, including the following colloquy:

"Q. Do you enjoy being in jail?

"A. No, I do not.

"Q. Can you give us an explanation why you did not tell Detective Castillo that you were somewhere else [at the time Rose was killed]?

"A. Because he probably would not have believed me at that point in time.

"Q. Did you even try?

"A. I figured there was no use even trying with him.

"Q. Why would you figure there is no use even trying? You gave him all kinds of other stories you wanted him to believe.

"A. Because . . . I did not know exactly what time that murder happened. I did not know exactly where I was at that point in time.

"Q. Well you could have done the exact same thing. Just told him everything you did the whole day.

"A. I imagine I could have done that, but I didn't.

"Q. Why not?

"A. I wasn't into helping him along with his investigation. He was trying to get me.

"Q. . . . [T]his investigator is trying to find out who committed a murder. You're his only suspect. If you knew you didn't commit the murder, why would you care if you're helping him? It is helping yourself, isn't it? It's not helping him. It's helping you.

"A. Past experience, every time I reach my hand out to help I get it slapped."

A short time later, the prosecutor and defendant had the following exchange:

"Q. Isn't it true, sir, you had many opportunities—Detective Castillo gave you opportunity after opportunity after opportunity to tell him where you were that entire day?

"A. Yes.

"Q. You never did, did you?

"A. No, I did not.

"Q. And in the year and eight months since this murder you have been in jail, correct?

"A. Yes, I have.

"Q. How many times have you seen him in the courtroom?

"A. Numerous.

"Q. Have you ever once tried to say, 'Detective Castillo, it wasn't me?' I mean, by now you have got the time of the murder, right?

"A. Yes."

When the prosecutor asked why defendant did not tell Detective Castillo that Silvia Gomez could explain his whereabouts at the time of the murder,

defendant replied, "I didn't figure it would do any good at that point. Especially after the prelim." Defendant also stated that he was serving a one-year sentence for a parole violation at that time. The prosecutor asked, "So you figured, 'I might as well stay in jail because I'm going to be doing this on a violation anyway.' Is that what you're telling us?" Defendant answered yes. The prosecutor then asked defendant why he did not contact Castillo about his alibi when the one-year sentence was completed. Defendant replied that he had told his attorney about his alibi. The prosecutor stated, "I'm not talking about your attorney. Talking about you." The prosecutor asked why defendant had not telephoned Castillo. Defendant replied that he "didn't figure at that point it would do any good."

The prosecutor asked defendant why he had not spoken to her about his alibi during the numerous court appearances in the case. Defendant replied that the prosecutor "was on [Castillo's] side of the street." In response to the prosecutor's questions, defendant acknowledged that he had never asked Silvia Gomez or his mother to tell the police or the prosecutor about his alibi.

During closing argument, the prosecutor discussed defendant's various explanations for not revealing his alibi and stated: "He's got an 'alibi'? And he doesn't tell anyone about it?" The prosecutor noted that defendant did not ask Silvia Gomez or his mother to convey his alibi and argued: "No, he doesn't mind staying in jail because he figured he was going to do a year on his parole violation anyway, et cetera, et cetera, et cetera. This is so unbelievably ludicrous it is preposterous. And I can't believe any of you buy it for one moment. If you have got a righteous alibi, ladies and gentlemen, you tell it. And you keep telling it until somebody believes you because you know it's true. The reason he didn't discuss his alibi was because at that point it hadn't been formulated yet. It hadn't been totally organized."

b. *Analysis*

Defendant complains the prosecutor's cross-examination and closing argument violated *Doyle, supra,* 426 U.S. 610, as well as his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and parallel provisions of the California Constitution. Defendant forfeited the objection by failing to object. (*People v. Huggins* (2006) 38 Cal.4th 175, 198 [41 Cal.Rptr.3d 593, 131 P.3d 995]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 118 [17 Cal.Rptr.3d 710, 96 P.3d 30]; *People v. Hughes* (2002) 27 Cal.4th 287, 332 [116 Cal.Rptr.2d 401, 39 P.3d 432].) Relying on *People v. Hill* (1998) 17 Cal.4th 800, 821 [72 Cal.Rptr.2d 656, 952 P.2d 673], defendant argues here, and with regard to other claims of prosecutorial misconduct, that he was relieved of his obligation to object because of the prosecutor's "constant barrage of misconduct." The record

does not reflect such extreme behavior by the prosecutor. Contrary to his assertion, defendant has not demonstrated that an objection would have been futile or that an admonition would not have cured any harm. While defendant complains the prosecutor repeatedly committed *Doyle* error, a prompt objection on this ground in the first instance would have allowed the trial court to evaluate the objection and make a ruling. Defendant asserts that if we deem this issue forfeited by counsel's failure to object, then his trial counsel rendered ineffective assistance in this respect. As we shall explain, defendant is not entitled to relief on this basis.

■ In *Doyle*, the United States Supreme Court held that it was a violation of due process and fundamental fairness to use a defendant's postarrest silence following *Miranda* warnings to impeach the defendant's trial testimony. (*Doyle*, *supra*, 426 U.S. at pp. 617–618.) However, *Doyle* does not apply when a defendant presents exculpatory testimony at trial inconsistent with a voluntary post-*Miranda* statement. (*Anderson v. Charles* (1980) 447 U.S. 404 [65 L.Ed.2d 222, 100 S.Ct. 2180] (*Anderson*).)

In *Anderson*, *supra*, 447 U.S. 404, a murder defendant waived his *Miranda* rights and said that he had stolen the victim's car from a particular location. At trial, he testified that he stole the car from a different location. The prosecutor, after questioning the defendant about his opportunity to change the facts, asked: " 'Don't you think it's rather odd that if it were the truth[,] that you didn't come forward and tell anybody at the time you were arrested, where you got the car?' " (*Anderson*, at p. 406.) The United States Supreme Court held: "*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." (*Anderson*, *supra*, 447 U.S. at p. 408.)

Here, defendant did not remain silent in response to *Miranda* warnings. He agreed to speak with the officers and never asserted his right to remain silent. Defendant's attempt to characterize a conflicting statement as "silence" cannot stand and is unsupported by the evidence. Detective Castillo testified that at the second interview he asked defendant to talk "about Thursday [January 23] because he had been found with $100 at the time of his arrest." Defendant acknowledged during this interview that Castillo gave him "opportunity after opportunity after opportunity" to state his whereabouts for "that entire day." In his first explanation, defendant accounted for his daylong whereabouts, from being dropped off in Lancaster in the morning to arriving

in Bakersfield that night. In his second explanation, defendant focused on his departure from Lancaster and events that followed. Defendant told Castillo that after using Rose's ATM card to withdraw money, "I was going to go to East L.A. and visit some of my homeboys." When the prosecutor asked defendant why he did not tell Detective Castillo he was going to see Silvia Gomez, defendant replied that he wanted to protect Gomez. Defendant testified further, "I wasn't into helping them with their investigation period. I figured I could use [Gomez] for my defense because I knew I was there."

Defendant was not "silent" on his whereabouts at the time of the murder; he chose to provide varied explanations that differed from his trial testimony. The Supreme Court stated in *Anderson* that each of the "inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of 'silence,' and we find no reason to adopt such a view in this case." (*Anderson, supra,* 447 U.S. at p. 409.)

Defendant also complains that the prosecutor did not question him about inconsistencies in his statements, but instead focused on his failure to reveal his alibi. The Supreme Court in *Anderson, supra,* 447 U.S. 404, addressed a similar attempt to parse the prosecutor's cross-examination. The Supreme Court noted that the underlying federal appeals court correctly recognized that the defendant could be questioned about prior statements inconsistent with his trial testimony. However, the appeals court further determined that the exchange regarding the defendant's " 'failure to tell arresting officers the same story he told the jury' " was an unconstitutional inquiry about postarrest silence. The Supreme Court rejected this analysis, explaining that the prosecutor's cross-examination could not be "bifurcated so neatly" and must be considered as a whole. (*Id.* at p. 408.) The Supreme Court concluded that questions regarding the defendant's failure to tell the police the same story "were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." (*Id.* at p. 409.)

Here, the prosecutor properly questioned defendant about the different explanations he gave Detective Castillo. As in *Anderson,* the prosecutor's questions regarding defendant's failure to come forward earlier with his alibi were asked in the context of those interview statements. The questions were a legitimate effort to elicit an explanation as to why, if the alibi were true, defendant did not provide it earlier. As such, neither the questions nor the prosecutor's remarks in closing argument were "designed to draw meaning from silence." (*Anderson, supra,* 447 U.S. at p. 409.)

Because the prosecutor's conduct was not improper on the ground of *Doyle* error, the failure to object on that basis did not result in a violation of

defendant's constitutional right to the effective assistance of counsel. (*People v. Salcido* (2008) 44 Cal.4th 93, 171–172 [79 Cal.Rptr.3d 54, 186 P.3d 437]; *People v. Lopez* (2008) 42 Cal.4th 960, 968 [71 Cal.Rptr.3d 253, 175 P.3d 4]; *People v. Dickey* (2005) 35 Cal.4th 884, 915 [28 Cal.Rptr.3d 647, 111 P.3d 921].)

■ Those portions of the prosecutor's cross-examination directed at defendant's failure to notify her or the police of his alibi after charges were filed and counsel had been appointed are potentially more problematic. The right to counsel attaches once the adversary judicial criminal process has been initiated. (*Rothgery v. Gillespie County* (2008) 554 U.S. 191, 198 [171 L.Ed.2d 366, 128 S.Ct. 2578, 2583].) A represented defendant may initiate contact with police, but he must waive his Sixth Amendment right to counsel, and that waiver must be voluntary, knowing and intelligent. (See *Montejo v. Louisiana* (2009) 556 U.S. ___, ___ [173 L.Ed.2d 955, 129 S.Ct. 2079, 2085]; *Patterson v. Illinois* (1988) 487 U.S. 285, 292, fn. 4 [101 L.Ed.2d 261, 108 S.Ct. 2389].) In light of defendant's answers to this line of questioning, the Sixth Amendment issue was not implicated. He does not claim that his decision not to contact law enforcement after charges were filed reflected his own reliance on his right to remain silent or resulted from his lawyer's counsel. We also note that, under the State Bar Rules of Professional Conduct, rule 2-100(A), the prosecutor may not communicate directly or indirectly with the defendant without the consent of his counsel.

### 3. *Prosecutorial Misconduct in Cross-examination of Defendant*

Defendant contends the prosecutor committed misconduct while cross-examining him, and that the alleged misconduct violated various state and constitutional rights.[7] In most instances, however, defendant either failed to object or to object adequately. (See *People v. Stanley, supra,* 39 Cal.4th at p. 952.) We reject his argument that objecting would have reinforced the inadmissible content of the prosecutor's comments and questions. This argument "would constitute an exception that would swallow the rule, for that could be true in nearly every case in which a defendant fails to object." (*People v. Wilson* (2008) 44 Cal.4th 758, 800–801 [80 Cal.Rptr.3d 211, 187 P.3d 1041].) Finally, even if he had preserved his misconduct claims, they would fail either on the merits or because defendant was not prejudiced.

The prosecutor asked a series of questions about defendant's telephone conversations with Silvia Gomez after his arrest. The prosecutor noted Gomez testified that defendant told her on Sunday, January 26, that the

---

[7] As to his prosecutorial misconduct claims, defendant contends the misconduct violated his right to due process, confrontation, and a reliable verdict. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16 & 17.)

murder was supposedly committed while he was at her house. The following colloquy between the prosecutor and defendant ensued:

"Q: Now, how did you know the murder had happened while you were at her house?

"A: I did not know at that point in time.

"Q. Then how could you possibly tell her that?

"A. I don't believe that I did tell her that on that date.

"Q. Then she is lying also, right?

"A. I believe she is mistaken of what telephone call she actually got the information from me.

"Q. Mr. Collins, only the murderer would have known that the murder occurred sometime between 5:00 and 6:30 or 5:00 and 7:00. Only the murderer and the people who heard the shots."

Defense counsel objected that no question was pending and asked that the prosecutor's comment be stricken. The trial court did not rule on the objection, but struck the comment as requested.

Defendant first argues that the prosecutor committed misconduct by asking him to comment on whether Gomez was lying. Having failed to object and request a curative admonition, his claim is forfeited. Moreover, it lacks merit. In *People v. Chatman* (2006) 38 Cal.4th 344 [42 Cal.Rptr.3d 621, 133 P.3d 534], we explained: "[C]ourts should carefully scrutinize 'were they lying' questions in context. They should not be permitted when argumentative, or when designed to elicit testimony that is irrelevant or speculative. However, in its discretion, a court may permit such questions if the witness to whom they are addressed has personal knowledge that allows him to provide competent testimony that may legitimately assist the trier of fact in resolving credibility questions." (*Id.* at p. 384; see *People v. Hawthorne* (2009) 46 Cal.4th 67, 97 [92 Cal.Rptr.3d 330, 205 P.3d 245].) Here, by choosing to testify, defendant put his own veracity at issue. He acknowledged telephone conversations with Gomez. Because defendant's testimony contradicted Gomez's, the prosecutor's question appropriately assisted the jury in resolving the issue of whose testimony was more credible. There was no misconduct.

Defendant also complains that during this same portion of cross-examination the prosecutor improperly commented that the timing of the

murder would be known only by the killer and those who heard the shots. Although the comment was argumentative, it was brief, and any possibility of prejudice was negated when the trial court, pursuant to the relief requested by defendant, struck the comment.

Next, defendant testified in direct examination that on the day he took Rose's car, he "had recently gotten out of prison and my values were not too straight as far as staying clean." In her cross-examination, the prosecutor asked defendant to identify any time in his life when his values were straight, and defendant responded, "Around 13, 14." Defendant additionally answered, "[W]ell, I had made a lot of mistakes as a youngster. I went to prison behind some of those mistakes." He acknowledged that he had been out of prison one month before he took Rose's car. The prosecutor asked, "In that whole month you were trying to do well, right?" Defendant replied yes. The prosecutor asked, "And you lasted a month before you got in this car, right?" After defendant said yes, the prosecutor asked, "That's a pretty good record for you, isn't it?" Defendant replied, "Not for me. That's what happened at the time."

Defendant complains that the prosecutor's question regarding a "pretty good record" improperly conveyed to the jury that defendant "had a history of criminality in which he re-offended shortly after being released," and improperly alluded to his juvenile record. Absent an objection and request for admonition, defendant has forfeited a misconduct claim. Moreover, in view of the overwhelming evidence of defendant's guilt, any error in the prosecutor's question was harmless.

In another incident, the prosecutor asked defendant why he had not stopped for gas at the Chevron station very near the McDonald's instead of driving to the gas station on Moorpark Street in North Hollywood. Defendant gave several different responses. He said that he was eating; that the area around the McDonald's was busy; and also that he might have seen the gas station near McDonald's but assumed he had enough gas to get to Bakersfield. The prosecutor asked, "Or maybe you wanted to go right by the murder scene to be sure the cops had found the body, yes?" Defense counsel objected that no question was pending, and the court sustained the objection.

The trial court's ruling is puzzling because the prosecutor *did* ask a question. She proposed an alternative for defendant's conduct and asked if it was true. Contrary to defendant's assertion, the question was not misconduct. In view of the proximity of the gas station to the murder scene, defendant's earlier explanations that he had not been to North Hollywood in three and a

half years and his multiple explanations for going near the murder scene, the prosecutor's question was legitimate.

Defendant argues the prosecutor committed misconduct by gratuitously commenting on several of his answers. In one incident, the prosecutor responded by stating, "A quick thinker, aren't you, Mr. Collins?" Defense counsel made an argumentative objection, which the trial court sustained. In another incident, the prosecutor stated, "Pretty sharp thinking, pretty smooth." Defense counsel stated, "Strike that from the record. There's no question pending. All afternoon long, she's been making editorial comments without questions." The trial court did not strike the comment, but advised the jury that statements of counsel are not evidence. In the first instance, defendant did not request that the jury be admonished. In the second instance, defendant did not object, but simply asked that the comment be stricken. Even if we assume defendant's claims are preserved, he suffered no prejudice. The prosecutor's comments, though gratuitous, were de minimis. (*People v. Osband* (1996) 13 Cal.4th 622, 695 [55 Cal.Rptr.2d 26, 919 P.2d 640].)

On two similar occasions defendant made no objection when the prosecutor commented on his answers, and has forfeited his misconduct claims. In the first instance, defendant answered a question posed by the prosecutor by recalling an earlier statement made by her. The prosecutor asked, "You remember almost every word in this case, don't you?" Defendant answered, "My life is on the line." The prosecutor responded, "So was Mr. Rose's." In the second instance, defendant explained that he tried to withdraw more than $200 using Rose's ATM card because he once had a card with no withdrawal limit. In a retort mocking this likelihood, the prosecutor asked, "Was that account in the name of Scott Rockefeller?" Even if defendant had preserved his claims, the prosecutor's comments were de minimis and could not have prejudiced defendant. (*People v. Osband, supra,* 13 Cal.4th at p. 695.)

We have rejected most of defendant's claims of prosecutorial misconduct and found any arguable misfeasance nonprejudicial. Accordingly, we reject his argument that a pattern of pervasive misconduct excused his failure to object. (*People v. Rundle* (2008) 43 Cal.4th 76, 157 [74 Cal.Rptr.3d 454, 180 P.3d 224].) For the same reason, we reject his further claim that the cumulative impact of the alleged misconduct resulted in prejudice and deprived him of a fair trial.

### 4. Asserted Misconduct in Closing Argument

Defendant claims that during closing argument the prosecutor referred to evidence outside the record and improperly argued evidence admitted for a limited purpose. He asserts this misconduct violated various state and federal constitutional provisions.[8]

#### a. Comments About Michael Hernandez

■ Witness Michael Hernandez was in custody and testified that he was afraid of defendant. Hernandez stated that before taking the stand he asked if he could change clothes so that defendant would not know where he was incarcerated. In closing argument, the prosecutor stated: "[Hernandez] was wearing a tee shirt when he came to court that had the name of the institution that he is in and he asked for another shirt. We didn't have one and he put the shirt on inside out hoping that he would hide the name of where he was." No evidence had been introduced regarding these particular facts. Defendant complains that the prosecutor referred to facts outside the record. "While counsel is accorded 'great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation],' counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence [citation]." (*People v. Valdez* (2004) 32 Cal.4th 73, 133–134 [8 Cal.Rptr.3d 271, 82 P.3d 296].)

Defendant forfeited his claim by failing to timely object and request an admonition. (*People v. Monterroso* (2004) 34 Cal.4th 743, 785–786 [22 Cal.Rptr.3d 1, 101 P.3d 956].) Further, any misconduct was harmless. The jury was aware that Hernandez was in custody and feared defendant. Seeing that Hernandez testified with his T-shirt inside out, the jury could reasonably infer that Hernandez sought to hide his location from defendant.

#### b. Use of Zamora's Prior Statement

On direct examination, Sergio Zamora said the items grabbed from the glove box by defendant and thrown out of the car were "[c]redit cards and I think a watch." Asked to describe the watch, Zamora replied that it was black. The prosecutor showed Zamora a Casio watch of the same model

---

[8] Defendant claims the misconduct violated his rights to confront and cross-examine witnesses, to a fair jury trial, to due process, and to a reliable determination of guilt and death eligibility under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and article I, sections 15, 16, and 17 of the California Constitution.

usually worn by Rose. Zamora could not identify the watch as similar because he saw only the wristband of the watch thrown by defendant.[9]

On cross-examination, defendant denied throwing a watch out the window, and believed Zamora made up this information "with prodding and pumping and suggestive questions." The prosecutor referred to a page from Zamora's statement to Detective Castillo and told defendant: "I'm referring to the interview which took place on January 25th at 2:15 a.m. at Bakersfield jail, Mr. Zamora said, he's asked basically what had been thrown out of the car and he says, 'and a watch.' And the detective says 'Yes?' Does that sound like the detective told [Zamora] what's been thrown out?" Defendant answered, "No, it does not." Defendant did not object to the prosecutor's quotation of the transcript.

In closing argument, defense counsel questioned Zamora's reliability about the watch, noting that Zamora testified "I think a watch" was thrown from the car. He asked the jury to consider Zamora's sobriety at the time of the observations and pointed out that no watch was recovered. In rebuttal, the prosecutor urged that defense counsel's representation of Zamora's testimony was "utterly false." She then read to the jury the portion of Zamora's interview with Detective Castillo, which she used in her cross-examination of defendant.

Defendant complains the prosecutor committed misconduct by improperly referring to facts not in evidence. He points out that while the transcript of Zamora's interview was used in cross-examination of defendant, Zamora was never questioned about the quoted portion's accuracy. Therefore, no foundation was laid for its admissibility. Respondent concedes that the quoted portion of the transcript was merely the statement of counsel. However, respondent correctly observes that defendant has forfeited his claim by failing to object and request that the jury be admonished.

Further, the misconduct was not prejudicial. Defendant claims Zamora's equivocal trial testimony was the only evidence linking defendant to Rose's watch. The argument fails. While Zamora's initial trial statement "I think a watch" was equivocal, his additional testimony was not. He described the watch as black. He could not say the Casio he was shown in court was similar because he had "just seen the bottom," or wristband. While defendant parses Zamora's testimony, the jury, considering all the answers in context, could find he was not equivocal about having seen defendant throw a watch. The prosecutor read from the transcript in an attempt to rebut defendant's

---

[9] Rose's Casio G-Shock watch was not found at the crime scene and was not among his personal effects at the morgue.

claim that officers prompted Zamora. But the transcript exchange added nothing to the essence of Zamora's testimony that he saw defendant discard a watch from the car. Zamora, of course, was subject to cross-examination on this subject. We are satisfied that the prosecutor's reference to this extrajudicial statement was harmless under any standard.

### c. *Comments About Defendant's Prior Conviction*

In the third instance of alleged misconduct, defendant contends that the prosecutor made improper use of his prior robbery conviction. The court ruled in limine that the prosecutor's introduction of defendant's prior conviction was admissible for impeachment. Defendant himself made use of the conviction without limitation. In his direct examination, defendant testified that he had been convicted of "armed robbery, assaults and possession of narcotics" and that he had been to prison. He explained that he had been released shortly before he stole Rose's car.

In her closing argument, the prosecutor discussed possible reasons why Rose might have cooperated with defendant: "Fred Rose didn't know this defendant. He knew nothing about his background. Didn't know about [defendant's] prior robbery with a gun, and perhaps his decision that he wasn't going to leave any witnesses alive this time." Defense counsel did not object. Instead, defense counsel responded in his closing argument: "You have an instruction . . . that the prior record of a witness . . . has a limited evidentiary value and it has a bearing upon the truthfulness of that witness on the stand." Defense counsel argued that the prosecution "has gone just a little bit beyond that and they have said, 'Well, what has happened in this particular situation is that [defendant] could not afford, did not want to leave a witness against him,' and that it's his motivation and the cause and the explanation for the death of Fred Rose." In rebuttal, the prosecutor responded: "Well, think about it. If you were a young man his age and you had just gotten out of prison for an armed robbery and you had just robbed someone else and kidnapped them, would you want to leave that person alive to identify them so you could go back to prison?" The prosecutor stated further, "Obviously the way he went to prison the first time someone must have identified him. He is not going to risk that again."

Outside the jury's presence, defense counsel argued: "I think counsel is now saying what may have been implied yesterday and that is because of [defendant's] prior episode of criminality, that he had a predisposition to commit that criminality. And that somehow would cause him to commit a murder as a consequence of it." Defense counsel urged that the prosecutor's argument "is an impermissible use of the prior conviction. And I would ask that the jury be admonished in that regard." The trial court stated, "Well, if I

understand [the prosecutor's] argument, it assumes a fact not in evidence, but it makes use of a rhetorical device that somebody might have identified him otherwise he would not have been to jail before. And that his motive now having been to jail before is to avoid going to jail by eliminating a witness."

The court then sought to confirm the basis of defense counsel's objection, asking, "You're taking the position that [the prosecutor's] argument is that the jury should consider the prior conviction as tending to show that the defendant is a bad person who is more likely because of that conviction to offend again?" Defense counsel responded, "And commit a homicide." The prosecutor replied, "That was not the thrust of my argument whatsoever." The trial court suggested the prosecutor clarify her argument and stated: "[I]f the People are allowed to argue that the motive is to eliminate a witness to avoid apprehension, then the fact that he was convicted of a felony and in prison once before has got nothing to do with that," and "[T]he basic thrust of the argument is that the person doesn't want to be [convicted] and, therefore, has a motive to eliminate a witness. And that stands on its own whether or not there was a prior conviction." The court offered to read again the instruction concerning "how [the jury] can use a felony conviction." Defense counsel agreed it would be appropriate for the court to do so. The prosecutor advised the court that she would refer to the instruction in her argument. She asked the number of the particular CALJIC instruction to which the court referred, but the record does not indicate she received an answer before counsel and the trial judge returned to the courtroom.

Continuing her argument, the prosecutor told the jury that one of the instructions "has to do with defendant's prior conviction. And for what purpose you can consider it. And you are not to consider it merely to show that he is a person predisposed to commit crimes. So the argument that I just gave you has nothing to do with his actual conviction. What I'm arguing to you is that inference[] that I believe common sense tells you why somebody who has been to prison before would not want to go back and would therefore want to eliminate a witness." Defendant did not object. At the close of the prosecutor's rebuttal, the trial court reread CALJIC No. 2.50, which had been modified to address the driveby shooting in Bakersfield, during which items were later thrown from the car by defendant.[10] Defendant did not object to this instruction or request that any other instructions be read.

---

[10] The jury was instructed as follows: "Evidence has been introduced for the purpose of showing that the defendant committed a crime or crimes other than that for which he is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that the defendant is a person of bad character or that he has a predisposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show the identity of the person who committed the crime for which the defendant is accused. [¶] The defendant had knowledge of the nature of things

On appeal, defendant claims the prosecutor "raised the issue of motive in the context of arguing that the evidence in her case supported a verdict that [defendant] committed the crimes charged. In short, she was arguing that evidence of motive was evidence of identity." Defendant did not object in the trial court on the basis that he advances on appeal. Rather, he confirmed below that he was objecting to the prosecutor's use of his prior conviction as showing a propensity to commit homicide based on a past offense, and asked that the jury be admonished in that regard. The trial court, which impliedly rejected defendant's interpretation of the prosecutor's argument, suggested the prosecutor clarify her argument to eliminate any reference to the prior conviction or imprisonment. Defendant did not object to the trial court's suggested clarification or otherwise renew his argument. He did not request any additional admonition and agreed that the trial court should again instruct the jury regarding the use of a felony conviction. He did not object to the prosecutor's further argument. Nor did he advise the court, as he now claims here, that the applicable jury instruction was CALJIC No. 2.23[11] rather than CALJIC No. 2.50. For these reasons we conclude defendant has forfeited his objection to the prosecutor's closing argument as finally framed. Defendant asserts that any further objection would have been futile. However, the trial court did not overrule his initial objection, and indeed proposed a solution to address it. There is nothing in the record to indicate that the trial court, upon a prompt objection, would not have addressed the argument as finally presented by the prosecutor.

■ In any event, the prosecutor's argument as ultimately delivered was not misconduct. "The prosecution is given wide latitude during closing argument to make fair comment on the evidence, including reasonable inferences or deductions to be drawn from it." (*People v. Harris* (2005) 37 Cal.4th 310, 345 [33 Cal.Rptr.3d 509, 118 P.3d 545].) The prosecutor did not rely on defendant's prior conviction to argue his predisposition to commit a crime. Nor did she urge that because defendant had a motive to kill he must have been the perpetrator. There was ample evidence that defendant was the person who kidnapped and robbed Rose. Indeed, the question of defendant's motive arose only in the context of what he chose to do with Rose after the robbery. Defendant testified that he had recently been released from prison at

---

found in his possession. [¶] The defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all the other evidence in this case. You are not permitted to consider such evidence for any other purpose."

[11] The jury was instructed with CALJIC No. 2.23 as follows: "The fact that a witness has been convicted of a felony, if this is a fact, may be considered by you only for the purpose of determining the believability of that witness. The fact of such a conviction does not necessarily destroy or impair a witness's believability. It is one of the circumstances that you may consider in weighing the testimony of that witness."

the time he took Rose's car. Based on this testimony, the prosecutor could argue the inference that defendant did not want to return to prison and decided to kill Rose to eliminate him as a witness. This argument was relevant to defendant's state of mind in connection with the prosecutor's theory that defendant committed first degree malice murder.

### 5. *Failure to Instruct on Unanimity for Theory of First Degree Murder*

■ Defendant argues the court erred in failing to instruct the jury to unanimously determine whether its murder verdict was based on a theory of premeditated murder or first degree felony murder. As defendant recognizes, we have repeatedly held that a unanimity instruction is not required. (*People v. Hawthorne, supra,* 46 Cal.4th at p. 89; *People v. Zamudio* (2008) 43 Cal.4th 327, 362–363 [75 Cal.Rptr.3d 289, 181 P.3d 105]; *People v. Harris* (2008) 43 Cal.4th 1269, 1295–1296 [78 Cal.Rptr.3d 295, 185 P.3d 727].) We reaffirm that rule.

### 6. *Use of Leading Questions in Cross-examination of Sergio Zamora*

Defendant contends the trial court committed reversible error in allowing the prosecutor to ask leading questions at several points during Sergio Zamora's direct and redirect examination.[12] He contends that by using leading questions, the prosecutor essentially testified for Zamora, who was not credible. The trial court did not abuse its discretion in permitting the leading questions.

■ " 'A "leading question" is a question that suggests to the witness the answer that the examining party desires.' (Evid. Code, § 764.) Questions calling for a 'yes' or 'no' answer are not leading unless they are unduly suggestive under the circumstances. (*People v. Williams* (1997) 16 Cal.4th 635, 672 [66 Cal.Rptr.2d 573, 941 P.2d 752]; 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 165, pp. 229–230.) Furthermore, leading questions are not always impermissible on direct examination. 'Evidence Code section 767, subdivision (a)(1), provides that leading questions "may not be asked of a witness on direct or redirect examination" except in "special circumstances where the interests of justice otherwise require." Trial courts have broad discretion to decide when such special circumstances are present. [Citations.]' (*Williams,* at p. 672.)" (*People v. Harris, supra,* 43 Cal.4th at p. 1285.)

---

[12] Defendant claims violations of unspecified statutory law as well as his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 15, 16, and 17 of the California Constitution.

Zamora testified that he originally lied to police, telling them that a "homeboy" admitted the killing. Zamora explained that he lied because he was afraid of defendant and because of his own involvement in the driveby shooting. The prosecutor then asked, "Now do you remember anything else that [defendant] told you about the killing of this man?" Zamora said "no," but acknowledged meeting with the prosecutor and Detective Castillo several days before his trial testimony. The prosecutor then asked, "Do you remember saying you had forgotten to tell us something because you were scared and now you want to tell us something else?" Defendant's leading objection was overruled and Zamora answered "yes," but said he forgot what he told them. The prosecutor then asked, "Do you remember telling us anything about what the defendant told you about the person in Los Angeles that he killed?" Zamora answered, "He just killed somebody up in L.A." The prosecutor then asked, "What else?" The court overruled defendant's objection that the question assumed facts not in evidence. The prosecutor then asked, "Did you tell us that he told you the guy was going to get something to eat, was on his way to lunch?" When Zamora said "yes," the prosecutor asked, "Do you remember telling us that he then grabbed him and put him in the car and took him to the bank and got 100 or 200 dollars?" Zamora replied "yes." Defendant objected to these latter two questions as leading and the trial court overruled those objections.

■ Leading questions are permitted on direct examination "to the extent necessary to stimulate or revive [the witness's] recollection." (3 Witkin, Cal. Evidence, *supra*, Presentation at Trial § 167, p. 231; see *People v. Williams, supra,* 16 Cal.4th at p. 672.) Zamora stated he could not remember the conversation he had with Detective Castillo and the prosecutor. When the prosecutor attempted to refresh his recollection, he claimed only a limited recall. Under these circumstances, the court did not abuse its discretion in permitting the two leading questions that followed in order to revive Zamora's recollection.

Furthermore, it appears Zamora's answers would have qualified as prior inconsistent statements under Evidence Code sections 770 and 1235. Zamora claimed he had forgotten statements made only a few days before. The trial court later described Zamora as "reluctant to answer" in this portion of his testimony, suggesting Zamora was evasive rather than truly forgetful. A claimed lack of memory can give rise to an implied inconsistency. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1008 [81 Cal.Rptr.3d 299, 189 P.3d 300]; *People v. Ervin* (2000) 22 Cal.4th 48, 84–85 [91 Cal.Rptr.2d 623, 990 P.2d 506].) Under these circumstances, the trial court would not have abused its discretion in allowing the prosecutor to lay the foundation for the inconsistent statement through leading questions. Detective Castillo later testified regarding the meeting with the prosecutor and Zamora and confirmed that Zamora made the statements elicited in the prosecutor's examination.

Defendant next complains about leading questions during the prosecutor's redirect examination of Zamora. Zamora admitted on cross-examination that at one point he told Detective Castillo defendant said nothing about killing anyone. Defense counsel also challenged Zamora's credibility by asking whether anyone told him what to say at trial; how much time he spent talking with the prosecution about his testimony; and whether he talked to the other Bakersfield witnesses during the trial. Counsel asked whether Zamora was testifying based on information in police reports rather than his own recollection. On redirect, the prosecutor affirmed Zamora's earlier interview statement that defendant admitted the killing. She quoted a question by Detective Castillo asking why defendant killed the victim, then asked Zamora, "Do you remember your answer, 'to get his money?' " When Zamora answered "yes," she quoted Castillo's next question, " 'And [what else]?' " and quoted Zamora's next answer: " 'And his wallet and his credit cards.' " The prosecutor then asked, "Is that true?" After Zamora said "yes," defense counsel interposed a "leading" objection, which the court overruled. The prosecutor continued quoting from the transcript, asking Zamora whether he remembered telling Castillo that defendant also killed the victim so he could get his car. The prosecutor also quoted Castillo's question as to why Zamora did not provide this information initially. She quoted Zamora's answer that he feared defendant, and asked, "Do you remember that?" Zamora answered "yes," after which defense counsel objected that the question was leading. The court overruled the objection.

The quoted portions of the interview, considered in context, were admissible as prior consistent statements under Evidence Code sections 791 and 1236. The prosecutor's use of "do you remember" and "is it true" questions were not leading. "Questions calling for a 'yes' or 'no' answer are not leading unless they are unduly suggestive under the circumstances." (*People v. Harris, supra,* 43 Cal.4th at p. 1285.) Here, the prosecutor was quoting from a transcript of Zamora's own statement, making improper suggestion unlikely.[13] If Zamora claimed he could not remember the answers, the prosecutor could have attempted to refresh his recollection by showing him the transcript. If Zamora denied making the statement, Detective Castillo could have been called to impeach his testimony.

Zamora testified on direct examination that defendant said only that he shot the victim. The prosecutor showed Zamora his preliminary hearing testimony and asked whether he testified previously that defendant admitted shooting the victim in the head. Zamora claimed that he had lied at the preliminary hearing and that he did not remember defendant making the statement. On

---

[13] Contrary to defendant's assertion, there is no requirement that transcripts of the prior statements be admitted in evidence before a witness can be questioned about their content. (See Evid. Code, §§ 768, subd. (a), 769.)

redirect examination, the prosecutor again asked Zamora if he ever heard defendant say he shot the victim in the head. Zamora said "yes." The prosecutor then directed Zamora to read two pages of his preliminary hearing testimony and asked, "Do you remember a little bit better now about that?" and Zamora said "yes." The prosecutor said, "Now, you remember that the other lawyer asked you the following questions," after which the prosecutor read a question asked at the preliminary hearing. Defense counsel interposed a nonspecific objection and then asked that the court note "a continuing objection to these questions, please." When defense counsel attempted to state the grounds for his objection, the court interrupted him and stated, "791 and 770, I believe, are both applicable of the Evidence Code." The prosecutor continued by reading the defense attorney's questions and Zamora's answers, each time asking Zamora whether he remembered giving those answers. In the quoted exchange, Zamora told defense counsel that the preliminary hearing was the first occasion during which Zamora had related defendant's statement that he shot someone in the head, and that Zamora was told this information by defendant.

 Defendant argues, as he did with the interview transcript, that the trial court erred in allowing the prosecutor to ask leading questions. It is not uncommon for advocates to confuse an attempt to refresh recollection with impeachment. Here the prosecutor inartfully treated her redirect questions as refreshing recollection when she was actually confronting Zamora with his prior testimony that contradicted his statements during direct examination. When impeaching a witness a questioner may be permitted to confront with leading questions. The court did not abuse its discretion in permitting such questions here.

### B. *Penalty Phase Issues*

#### 1. *Sufficiency of the Evidence of Unadjudicated Criminal Activity*

 Under section 190.3, factor (b) (hereafter factor (b)), a jury may consider other criminal activity involving the use of, or threat or attempt to use, force or violence.[14] " 'Evidence of prior criminal behavior is relevant under section 190.3, factor (b) if it shows "conduct that demonstrates the commission of an actual crime, specifically, the violation of a penal statute . . . ." ' [Citations.]" (*People v. Hughes, supra,* 27 Cal.4th at p. 382; see *People v. Lancaster* (2007) 41 Cal.4th 50, 93 [58 Cal.Rptr.3d 608, 158 P.3d 157].) Evidence was admitted showing that defendant had possessed a Molotov

---

[14] Specifically, factor (b) permits the introduction of evidence in aggravation consisting of "[t]he presence . . . of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

cocktail on April 20, 1986, and a pocketknife on January 13, 1989. In instructing the jury, the trial court identified the first offense as "[p]ossession of a destructive device with intent to injure or intimidate a person," and identified the second offense as "[p]ossession of a concealed weapon." At defendant's request, the trial court did not instruct the jury with the elements of either offense. As to both incidents, defendant argues the evidence was insufficient to allow a rational trier of fact to determine beyond a reasonable doubt that he committed those offenses.

### a. *Possession of a Destructive Device*

Lisa Nevolo testified that, while sitting in her car near Joseph's market, she saw defendant holding a tire iron and a glass bottle of fluid with a rag on top. Moments after he disappeared from her view, Nevolo saw a large flash. Sergeant John Mosely responded to the scene and recovered from the burned area of the parking lot a glass bottle fragment with a charred rag inside. He described the object that had caused the fire as a Molotov cocktail. In arguing for its admission, the prosecutor urged that defendant's conduct was a violation of section 12303.3, possession of a destructive device with intent to injure, intimidate or terrify.[15] Section 12301, which defines destructive devices, includes "[a]ny breakable container which contains a flammable liquid with a flashpoint of 150 degrees Fahrenheit or less and has a wick or similar device capable of being ignited, other than a device which is commercially manufactured primarily for the purpose of illumination." (§ 12301, subd. (a)(5).)[16]

Defendant acknowledges that Molotov cocktails may fall within section 12301, subdivision (a)(5). (See *People v. Quinn* (1976) 57 Cal.App.3d 251, 258 [129 Cal.Rptr. 139] [device defined by § 12301, subd. (a)(5) is "apparently a 'Molotov cocktail' "].) But defendant asserts that the liquid-filled bottle here, even if described as a Molotov cocktail, was not a destructive device as defined by statute because there was no evidence of the flashpoint of the liquid. Because the evidence failed to establish a necessary element of section 12301, subdivision (a)(5), we presume the evidence was insufficient.[17]

---

[15] Section 12303.3 provides: "Every person who possesses, explodes, ignites, or attempts to explode or ignite any destructive device or any explosive with intent to injure, intimidate, or terrify any person, or with intent to wrongfully injure or destroy any property, is guilty of a felony, and shall be punished by imprisonment in the state prison for a period of three, five, or seven years."

[16] "Flashpoint" is defined as "the lowest temperature at which vapors above a volatile combustible substance ignite in air when exposed to flame." (Merriam-Webster's Collegiate Dict. (10th ed. 2000) p. 443.)

[17] We express no opinion on the kind of circumstantial evidence that might suffice to satisfy this statutory element. Respondent alternatively argues the liquid-filled bottle could have

Nevertheless a rational trier of fact could have found that defendant engaged in criminal activity involving an implied threat of violence. "The proper focus for consideration of prior violent crimes in the penalty phase is on the facts of the defendant's past actions as they reflect on his character, rather than on the labels to be assigned" to those crimes. (*People v. Cain* (1995) 10 Cal.4th 1, 73 [40 Cal.Rptr.2d 481, 892 P.2d 1224].) At a minimum, defendant aided and abetted an act of vandalism. While evidence regarding the liquid-filled bottle in defendant's possession might not satisfy the technical elements of sections 12301 and 12303.3, the evidence is undisputed that the parking lot was burned just moments after defendant was seen holding the bottle and tire iron. Given the earlier altercation between defendant and Joseph, the burning of the parking lot could reasonably be considered an attempt to intimidate Joseph by an implied threat of violence. (*People v. Monterroso, supra,* 34 Cal.4th at pp. 770–771 [admitting evidence of vandalism of van]; see *People v. Chatman, supra,* 38 Cal.4th at pp. 397–398 [admitting evidence of arson of apartment]; *People v. Stanley* (1995) 10 Cal.4th 764, 824 [42 Cal.Rptr.2d 543, 897 P.2d 481] [admitting evidence of car arson].)

That the conduct was given an inappropriate label is not prejudicial, particularly since the jury was never instructed with the elements of the offense. "The actual—and proper—focus of the penalty phase was defendant and his capital crime." (*People v. Clair* (1992) 2 Cal.4th 629, 680–681 [7 Cal.Rptr.2d 564, 828 P.2d 705].) The incident with the Molotov cocktail was "of marginal significance to the picture presented of the murder and the murderer. Similarly, any inappropriate label attached to the [incident] would have added little. Therefore, a label of this sort could not have affected the outcome within any reasonable possibility, and hence must be held harmless beyond a reasonable doubt." (*Id.* at p. 681.)

---

qualified as a destructive device under section 12301, subdivision (a)(1), which refers to "[a]ny projectile containing any explosive or incendiary material or any other chemical substance, including, but not limited to, that which is commonly known as tracer or incendiary ammunition, except tracer ammunition manufactured for . . . shotguns," or under section 12301, subdivision (a)(2), which refers to "[a]ny bomb, grenade, explosive missile, or similar device or any launching device therefor."

Defendant argues that if Molotov cocktails are either projectiles or bombs under section 12301, subdivision (a)(1) or (2), it would be unnecessary to distinguish such devices based on the flashpoint of the liquid they contain. As to section 12301, subdivision (a)(1), defendant undertakes a detailed analysis of the term "projectile" as used in California statutes and concludes the term refers to projectiles similar to tracer ammunition. As to section 12301, subdivision (a)(2), he argues that a Molotov cocktail is an incendiary device, not a "bomb" as contemplated by this subdivision. We need not consider these alternative arguments. We note that the parties and trial court never discussed the statutory requirements of section 12301. As we shall explain, any error in admitting the evidence was harmless beyond a reasonable doubt.

### b. *Possession of a Concealed Weapon*

In the second incident, Officer Dattola recovered an open pocketknife from defendant's pants pocket following his arrest. The prosecutor argued the knife was a concealed weapon. Respondent concedes that possession of a pocket-knife was insufficient to establish a violation of section 12020 because, at the time the offense was committed, a pocketknife did not fall within the statutory definition of a concealed weapon. (See *People v. Bain* (1971) 5 Cal.3d 839, 851–852 [97 Cal.Rptr. 684, 489 P.2d 564]; *People v. Forrest* (1967) 67 Cal.2d 478, 480–481 [62 Cal.Rptr. 766, 432 P.2d 374].)[18]

Error in the admission of evidence under factor (b) is reversible only if "there is a reasonable possibility it affected the verdict," a standard that is "essentially the same as the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]." (*People v. Lancaster, supra*, 41 Cal.4th at p. 94.) The jury properly heard evidence of defendant's other criminal activity, which included a robbery, a stabbing, an assault with a knife against children, and the robbery and extortion of a jail inmate. There is no reasonable possibility that the jury's penalty decision was improperly affected by this relatively minor incident.

### 2. *Failure to Strike Testimony of Fred Joseph*[19]

Before Fred Joseph testified about the events at his market on April 20, 1986, defense counsel objected that the incident involved only damage to property and did not qualify as aggravating evidence under factor (b). The prosecutor advised that a Molotov cocktail was thrown at Joseph's business while it was open and employees were present. On this representation, the court admitted Joseph's testimony.

On direct examination, Joseph testified that two carloads of young men pulled into the parking lot of his market shortly before 9:00 p.m. He ran

---

[18] Respondent nevertheless argues that the evidence was sufficient to establish a violation of section 415 because defendant, by waving his arms and shouting, appeared to be initiating a fight with another man when he was first seen by the officer. Respondent argues that possession of the knife was properly elicited as part of that crime. We reject this speculative argument.

[19] As we shall discuss, *post*, the trial court granted a new penalty trial. While the principal basis for the trial court's order was juror misconduct during deliberations, the court also stated that its ruling was based on its failure to strike Joseph's testimony regarding other crimes. For reasons we shall explain in our consideration of the trial court's order granting the new penalty trial motion, we review the trial court's failure to strike Joseph's testimony as an independent claim of error rather than as a separate ground supporting the trial court's new penalty trial ruling.

inside the store because he was frightened. Three weeks before, defendant had threatened him. On that earlier occasion, defendant was standing at the back door of the market, intimidating customers and asking for money. Joseph's brother told defendant to leave. Joseph approached and defendant "started getting wise" with him. Joseph went back inside the store at his brother's direction. The brother later told Joseph that defendant threatened to kill Joseph.

On cross-examination, Joseph volunteered additional details regarding the earlier incident. He testified that defendant returned to the store about an hour after he was told to leave. When Joseph saw defendant and another man walk across the parking lot, Joseph ran upstairs behind the security gates while the police were called. Joseph watched as defendant and the other man walked up and down the aisles and then left. Joseph said the police arrested defendant and found a knife, but they "let him go because it was an illegal search." Joseph told defense counsel that after this incident, he contacted Judge Jack Gold of the juvenile court and the probation department "to get [defendant] locked up." When asked by defense counsel if he knew whether Judge Gold had any contact with defendant, Joseph replied, "I have only heard hearsay that [defendant] was looking for Jack's house. And they got [defendant] sent to Florida or something after that." Joseph also volunteered on cross-examination that he contacted "people down the street that [defendant] had threatened at the stained glass shop. It wasn't only me that he threatened in the area." Additionally, with regard to events on April 20, Joseph told defense counsel that the burned area of the parking lot was about 150 feet from his store, where trash cans are located.

Following Joseph's testimony, defense counsel renewed his argument that the incident on April 20 did not involve violence against a person. Defense counsel argued against further testimony absent an offer of proof and requested the jury be admonished to disregard Joseph's testimony. The prosecutor stated that she had not expected Joseph's testimony regarding the location of the fire, but nevertheless argued that the incident still satisfied the requirements of factor (b). After extended colloquy, the trial court continued the matter and requested briefing on the issue.

Following briefing and argument, the trial court was inclined to strike Joseph's testimony. The court noted the distance between the store and the area actually burned. It reasoned, somewhat obscurely, that in order for the jury to conclude the act was intended as a threat to Joseph, it had to rely on hearsay evidence of defendant's earlier threat to kill Joseph. The trial court also expressed concern regarding Joseph's account of other acts by defendant. Citing Evidence Code section 352, the court believed that "the jury would have a tendency not to focus on whether or not [the Molotov cocktail] was

possessed in order to threaten Mr. Joseph, but would focus on all the other aspects that had been introduced . . . and I think that would be more prejudicial than probative." Nevertheless, after further argument from the prosecution, the court did not rule at that time.

The next day, the court revisited the issue and explained that it had done more research. It expressed significant reservations with Joseph's testimony, but concluded it did not have the authority to exclude all evidence of the incident. Defense counsel responded that he and the prosecutor both agreed that it would be "counterproductive" to recall Joseph, and that "[s]imilar problems are engendered if the jury is instructed in some fashion or another to disregard or not pay attention to the testimony of Mr. Joseph. They have in fact heard it." Defense counsel suggested that a stipulation or instruction could resolve problems caused by Joseph's testimony regarding other incidents. The prosecutor recited a proposed limiting instruction. The trial court suggested additional language, which defense counsel accepted. When the court asked if both counsel could agree on an instruction, defense counsel answered, "I believe so. We discussed it quite a bit over the noon hour and I think our thought processes are pretty close." The instruction submitted by counsel and read to the jury was as follows: "With respect to the testimony of Mr. Fred Joseph, you are advised that anything he testified to which he claimed was related to him by others is not to be considered by you for the truth of those facts. [¶] You are only to consider such testimony as it may have affected Mr. Joseph's state of mind. Mr. Joseph's state of mind cannot be imputed to the defendant."

Defendant contends the trial court erred in failing to strike Joseph's testimony regarding uncharged crimes committed by defendant. He claims he was not given notice under section 190.3, which provides in pertinent part that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." In view of the prosecutor's anticipated evidence, there was no failure of notice.

Preliminarily, we note that defendant moved to strike Joseph's testimony in the trial court only because the evidence failed to demonstrate a threat of violence to a person. It was the *trial court*, not defendant, who raised the issue of Joseph's references to other bad acts. The trial court described Joseph as "very hard to control as a witness." Later, in its ruling on defendant's motion for a new penalty trial, the court stated that Joseph had "volunteered" acts of violence by defendant that had not been included in the notice provided by the prosecutor. The court stated it was "not assigning fault" because counsel "had no way of knowing from one minute to the next" what Joseph would say during his "outbursts."

There is no evidence in the record that the prosecutor was aware that Joseph would testify regarding additional acts by defendant. With the exception of the threat made by defendant three weeks before the Molotov cocktail incident, all the other evidence about which defendant complains was volunteered during cross-examination. Defendant fails to explain how the prosecutor was required to give notice of aggravating evidence about which she was either unaware or which she did not elicit.

Ultimately, defense counsel made a reasonable strategic choice not to request that Joseph's testimony be stricken. He joined with the prosecutor in drafting a limiting instruction. Defense counsel's statement in the trial court indicates he believed a limiting instruction was more effective in this circumstance than asking jurors to disregard testimony. Defendant's tactical choice precludes a claim of error on review. (*People v. Burgener* (2003) 29 Cal.4th 833, 879 [129 Cal.Rptr.2d 747, 62 P.3d 1]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

### 3. *James Park Cross-examination*

Defendant contends the prosecutor committed misconduct during cross-examination of James Park, a former administrator in the California Department of Corrections. Defendant asserts the prosecutor asked questions that improperly and incorrectly suggested that defendant might be released, even if sentenced to life in prison without possibility of parole. Although the trial court admonished the jury, defendant claims the court erred in failing to grant his motion for a mistrial.[20]

The prosecutor asked Park, "Are you familiar with the concept of the 30-year review procedure?" Defendant did not object. Park answered, "Not in detail. I know they do feel they ought to review prisoners from time to time even though they have no parole opportunity." When the prosecutor asked if subsequent reviews occur every five years, Park responded that he did not know, but accepted that possibility. The prosecutor moved on to questions regarding prison security. The trial court sustained defendant's objection to the prosecutor's question about a recent prison escape, after which the prosecutor asked to approach the bench. The court met with counsel in chambers.

The prosecutor advised that she wanted to make an offer of proof regarding her escape question. After some discussion, the trial court then asked, "What is this thing about a 30-year review procedure? Is the jury supposed to now

---

[20] Defendant claims the court's error violated his state and federal rights to due process, a fair trial, and a reliable penalty proceeding.

speculate life without parole means something other than that?" The prosecutor responded, "I did not suggest this. There is a difference between the governor's power to commute and the 30-year review." The court described her answer as disingenuous and stated, "Whatever the source is you have now introduced to the jurors the suggestion that there is such a thing as a 30-year review." Although the court acknowledged that it was unaware of the 30-year review procedure, it believed her question implied a review for release.[21] Nevertheless, the court advised that any harm could be cured by an instruction.

The trial court and counsel then returned to the prosecutor's question regarding the prison escape, after which defense counsel asked how the court intended to address the issue of the 30-year review. The court again stated that it was unclear about the purpose of the 30-year review, noting there were several reasons why the Board of Prison Terms (now Board of Parole Hearings) might review a prisoner's status. The court stated that if the review was for an administrative rather than parole purpose, it would admonish the jury. Park was examined in chambers. He acknowledged that he was not aware of all Board of Prison Terms policies but stated that parole consideration was not given at the 30-year review. The court asked whether the review concerned "making sure somebody just doesn't get lost in terms of classification." Park replied that classification is part of the purpose, but conceded that he did not know the scope of the review. Park stated that the parole board "like[s] to keep a string on everybody. But certainly it has nothing to do with parole." The parties agreed that defense counsel, in his redirect examination, would elicit Park's testimony as to his understanding of the 30-year review. After a further discussion regarding the court's proposed admonition, defense counsel made a motion for a mistrial. The court denied the motion, stating that a curative instruction was sufficient. The court invited comment from defense counsel on the content of the instruction, but defense counsel submitted the matter.

Park testified on redirect examination that the 30-year review conducted by the Board of Prison Terms "is not a parole hearing in any way." As to the

---

[21] The prosecutor never advised the trial court of the purpose of the 30-year review referenced in her question. On appeal, defendant claims the prosecutor was referring to California Code of Regulations, title 15, former section 2817, concerning executive clemency, which provided in subdivision (a) that prisoners serving sentences of life without possibility of parole, who have suffered no more than one felony conviction, "shall be considered by the board for possible referral to the Governor." Subdivision (b) of former section 2817 provided in part that "[t]hose prisoners described in (a) whose commitment offense was after September 11, 1982, shall be reviewed 30 years after reception and every fifth year thereafter." Section 2817 was repealed December 20, 1993, effective January 19, 1994 (Cal. Code Regs., tit. 15, § 2817, Register 93, No. 52 (Dec. 31, 1993)), and thus was in effect at the time of defendant's penalty trial. Respondent does not concede that this regulation was the basis of the prosecutor's question.

goal of the review, Park said he assumed from past experience that the intent is "to be assured that the prison system is working properly for that particular prisoner." At the conclusion of Park's testimony, the court instructed the jury: "Life without possibility of parole means exactly that, and for purposes of determining the sentence in this case, you must assume the defendant will never be paroled."

Respondent argues that defendant forfeited his claim of prosecutorial misconduct by failing to make a timely objection on that ground and requesting that the jury be admonished. However, in view of the extended colloquy among the court and counsel on the propriety of the prosecutor's questions, we consider defendant's motion for a mistrial sufficient to preserve his claim.

In *People v. Ramos* (1984) 37 Cal.3d 136, 155–159 [207 Cal.Rptr. 800, 689 P.2d 430], we struck down the so-called Briggs Instruction informing the jury that the Governor is empowered to commute a sentence of life imprisonment without possibility of parole. Defendant argues that the prosecutor's questions, like the Briggs Instruction, invited the jury to speculate that defendant's sentence of life without possibility of parole might be commuted, or that defendant might be released by pardon or parole. Even if we assume the prosecutor's questions were misconduct, they were harmless under any standard. (*People v. Keenan* (1988) 46 Cal.3d 478, 509 [250 Cal.Rptr. 550, 758 P.2d 1081].) The questions were brief, isolated, and ambiguous. Park ultimately testified that the event was an administrative review unrelated to parole. The trial court admonished the jury that "life without possibility of parole means exactly that," and that the jury must assume for sentencing purposes that defendant will never be paroled. The admonition was adequate. (See *People v. Montiel* (1993) 5 Cal.4th 877, 932 [21 Cal.Rptr.2d 705, 855 P.2d 1277].)

Defendant complains that the admonition did not cure the harm because it did not address other means of release such as commutation or pardon. Although he now contends the 30-year review was a reference to the Governor's clemency power, there was no evidence before the jury to suggest this was the case. There was no mention by the prosecutor or Park of commutation or pardon. Defendant declined the court's invitation to comment on its content. If defendant wanted additional language in the admonition, he had the opportunity to request it. Having failed to do so, he has forfeited any further claim of error.

### 4. *Prosecutorial Misconduct During Closing Argument*

■ Defendant identifies numerous alleged examples of prosecutorial misconduct during closing argument depriving him of his federal and state constitutional rights.[22] We reject his claims.

"The same standard applicable to prosecutorial misconduct at the guilt phase is applicable at the penalty phase. [Citation.] A defendant must timely object and request a curative instruction or admonishment. Failure to do so forfeits the claim on appeal unless the admonition would have been ineffective." (*People v. Valdez, supra*, 32 Cal.4th at p. 132.)

#### a. *Prosecutor's Comment on Defendant's Lack of Remorse*

Defendant argues that the prosecutor twice improperly asked the jury to rely on defendant's lack of remorse as a factor in aggravation. In the first instance, the prosecutor began her argument with a general explanation of the section 190.3 factors. Regarding the circumstances of the crime under section 190.3, factor (a), the prosecutor told the jury, "[W]e are not just talking about the robbery or the kidnapping or murder of Fred Rose that you heard about at the guilt phase. [¶] We are also talking about, and you are allowed to consider, the impact to the victim and to the victim's family. [¶] You are allowed [to] consider whether defendant expressed any remorse or not. And other things which directly relate to that particular crime." As the prosecutor attempted to move on to factor (b), the trial court interrupted and asked counsel to approach the bench. At a conference in chambers, the court stated its understanding that absence of remorse is a not a factor in aggravation. The prosecutor replied, "I didn't say it was, your Honor. I said they are allowed to consider that. And that is the law. They are allowed to consider that." The court told the prosecutor her understanding of the law was incorrect. The prosecutor responded, "Factors relating to the circumstances of the crime whether the defendant right after the crime may have gone to someone and said, 'I'm sorry' are all things a jury can consider. You are precluding me from telling them that and that is not correct." The court invited a response from defense counsel, who stated, "Submitted." The trial court then advised the prosecutor, "You may proceed. There is a difference between—never mind. Go ahead."

At the outset, the parties dispute whether defendant has forfeited his claim of misconduct. The prosecutor argues that defendant never objected nor requested an admonishment. However, the reason for the forfeiture rule is

---

[22] Defendant relies on the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and article I, sections 7, 15, 16, and 17 of the California Constitution to assert violations of rights to due process and a fair and reliable penalty trial.

that "[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided." (*People v. Vera* (1997) 15 Cal.4th 269, 276 [62 Cal.Rptr.2d 754, 934 P.2d 1279].) Here, the trial court in effect interposed its own objection by interrupting the prosecutor immediately after her remark to the jury. In chambers, the trial court and the prosecutor disagreed about the propriety of her remark. Defense counsel submitted the matter after the colloquy between court and counsel. Under these circumstances, the claim is preserved.

■■■ Conduct or statements demonstrating a lack of remorse made at the scene of the crime or while fleeing from it may be considered in aggravation as a circumstance of the murder under section 190.3, factor (a). (*People v. Bonilla* (2007) 41 Cal.4th 313, 356 [60 Cal.Rptr.3d 209, 160 P.3d 84]; *People v. Pollock* (2004) 32 Cal.4th 1153, 1184 [13 Cal.Rptr.3d 34, 89 P.3d 353].) "On the other hand, *postcrime* evidence of remorselessness does not fit within any statutory sentencing factor, and thus should not be urged as aggravating." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1232 [275 Cal.Rptr. 729, 800 P.2d 1159].)

Defendant relies on the prosecutor's statements in chambers to support his claim of misconduct, but the jury was not privy to these remarks. For the purpose of determining misconduct, we consider only the prosecutor's argument to the jury. At the point in which she made her comment, the prosecutor was generally explaining the factors under section 190.3 rather than arguing the evidence supporting those factors. As fairly viewed, the prosecutor's statement that "[y]ou are allowed [to] consider whether defendant expressed any remorse or not" must be read together with the next phrase of her argument in which she stated, "[a]nd other things which directly relate to that particular crime." As understood in its entirety, the prosecutor's language conveys that any consideration of remorselessness must be made in the direct context of the crime. That statement was not improper.

In the second instance about which defendant complains, the prosecutor told the jury: "Now, you know, remorse is probably a factor that reasonably moral people would like to use for assessing whether someone is deserving of mercy. Lack of remorse, I can express to you is not, not, I repeat, not a separate aggravating factor. But it's an indicator of character. It's something you can consider." She argued that defendant "has never been remorseful for anything he has ever done." The prosecutor told the jury that remorse is "probably the one potential mitigating factor that more than anything else would go to whether mercy should be considered, and it's not here."

Defendant argues that the prosecutor encouraged jurors to believe defendant's lack of remorse was evidence of bad character which could be

considered as an aggravating circumstance. The claim is forfeited for lack of failure to object at trial. It also lacks merit. The prosecutor expressly advised the jury that lack of remorse is not an aggravating factor. In context, her argument simply pointed out that defendant had never demonstrated remorse, thus depriving him of that factor in mitigation. This argument was proper. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1175 [63 Cal.Rptr.3d 297, 163 P.3d 4]; *People v. Cook* (2006) 39 Cal.4th 566, 611 [47 Cal.Rptr.3d 22, 139 P.3d 492].)

### b. *Comments Regarding Vengeance*

Defendant argues the prosecutor engaged in misconduct when she inappropriately called for vengeance from the jury.

The prosecutor told the jury that vengeance plays a legitimate role in the criminal justice system. She quoted from an unidentified source, stating: " 'The idea of punishment is unintelligible if severed from the idea of retribution, which is inseparable from the concept of vengeance which is an expression of society's anger. If you have no anger, you have no justice. The society incapable of sustained focused anger in the form of controlled vengeance is decadent.' " Quoting further, she urged that society is protected and strengthened by " 'administering punishments that express and nourish through controlled indignation the vigor of our values.' "

Because an admonition would have cured the harm, defendant has forfeited his claim by failing to object. (*People v. Zambrano, supra,* 41 Cal.4th at p. 1177.) Moreover, it is without merit. The prosecutor's remarks were similar to those made by the prosecutor in *Zambrano,* and our reasoning in that case applies with equal force here. We noted in *Zambrano* that it is not error to argue "that the death penalty, where imposed in deserving cases, is a valid form of community retribution or vengeance—i.e., punishment—exacted by the state, under controlled circumstances, and on behalf of all its members, in lieu of the right of personal retaliation." (*Id.* at p. 1178.) As in *Zambrano,* the prosecutor's comments "did not seek to invoke untethered passions, or to dissuade jurors from making individual decisions, but only to assert that the community, acting on behalf of those injured, has the right to express its values by imposing the severest punishment for the most aggravated crimes." (*Id.* at p. 1179.) No misconduct occurred.

Continuing her argument about the social contract, the prosecutor focused on the Rose family. Defendant argues the prosecutor improperly informed the

jury that the Rose family wanted a death verdict.[23] The prosecutor argued: "Now, the Rose family is part of this social contract. They have given up their right to take personal vengeance on the defendant because they're law abiding. In return, they're entitled to action of the state that serves the same purpose. They're entitled to vengeance, plain and simple. They're not allowed to get him themselves. They're not allowed to take this defendant to Clybourn and Chandler in North Hollywood and shoot a bullet in his head. They gave up their right to vengeance like we all did because we are law abiding, but we owe them something in return and something they are not entitled to get on their own."

█ It is improper for the victim's family to express their opinion regarding the proper verdict. (*Booth v. Maryland* (1987) 482 U.S. 496, 508–509 [96 L.Ed.2d 440, 107 S.Ct. 2529].) Although *Booth* was overruled in part, the Supreme Court left intact its holding that "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." (*Payne v. Tennessee* (1991) 501 U.S. 808, 830, fn. 2 [115 L.Ed.2d 720, 111 S.Ct. 2597].) Defendant acknowledges the Rose family never gave testimony requesting the death penalty, but claims the prosecutor's argument conveyed this information, and thus referred to facts not in evidence or implied the existence of facts known only to the prosecutor.

Again, defendant's failure to object and request an admonishment forfeits review of his claim. Even if the prosecutor's argument could be understood as representing the family's view, any error was harmless. The prosecutor's remarks were somewhat ambiguous and constituted only a small portion of her larger argument, which focused primarily on the factors in aggravation and mitigation.

### c. *Statement Regarding Mercy for Defendant*

█ The prosecutor told the jury that she would "be satisfied if you extend to this defendant the same sympathy and the same mercy that he extended to Fred Rose." Defendant asserts the prosecutor's comment was an improper appeal to the passions and prejudices of the jury, and thus misconduct. By failing to object and request that the jury be admonished, defendant has forfeited his claim. The claim is also without merit. In the penalty phase of a capital trial, "[c]onsiderable leeway is given for appeal to the emotions

---

[23] As we shall discuss, *post*, the trial court granted a new penalty trial. While the principal basis for the court's order was alleged juror misconduct during deliberations, the court also addressed the prosecutor's remarks in closing argument regarding the victim's family. For reasons we shall explain in our consideration of the new penalty trial order, we review the propriety of the prosecutor's remarks as an independent claim of prosecutorial misconduct.

of the jury as 'long as it relates to relevant considerations.' " (*People v. Benavides* (2005) 35 Cal.4th 69, 108 [24 Cal.Rptr.3d 507, 105 P.3d 1099].) It is not improper to urge the jury to show the defendant the same level of mercy he showed the victim. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1418 [58 Cal.Rptr.3d 368, 157 P.3d 973]; *People v. Benavides, supra,* 35 Cal.4th at p. 109.)

### d. *Manner in Which Victim Was Killed*

Defendant claims the prosecutor committed misconduct by arguing facts not in evidence regarding the manner in which the victim was killed. The prosecutor argued that the victim was shot by defendant while he "was either on his knees pleading for mercy or running away in fear from this defendant." Defense counsel objected. The trial court did not rule, but stated, "The jury has already heard previously that statements of counsel are not in evidence."

The prosecutor's argument was proper. Although it is misconduct to misstate facts, the prosecutor "enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom." (*People v. Hamilton* (2009) 45 Cal.4th 863, 928 [89 Cal.Rptr.3d 286, 200 P.3d 898].) The prosecutor's comments were reasonable inferences from the record. Dr. William Sherry had testified that Rose had small abrasions on the back and knuckles of the left hand, a scratch on the right knee, and an abrasion just below the knee. Assuming Rose was standing with his hands at his sides and looking straight ahead, the trajectory of the gunshot was back to front, slightly left to right, and slightly downward. Dr. Sherry said that the trajectory was consistent with the victim kneeling and the shooter standing, which might also account for the abrasion on the victim's knee. In response to defense counsel's question, Dr. Sherry acknowledged that the trajectory of the bullet was consistent with the victim's head having been tilted backward.

Defendant claims the prosecutor argued, in effect, that her scenarios were the *only* two ways in which the shooting could have occurred. She did not do so. Nor is there a reasonable likelihood the jury understood the prosecutor's remarks in such a manner. (*People v. Frye* (1998) 18 Cal.4th 894, 970 [77 Cal.Rptr.2d 25, 959 P.2d 183].) The jury heard Dr. Sherry testify on cross-examination that "there are probably millions of different possibilities depending upon the position of the weapon and the position of the body and specifically the head of the person who was struck." Moreover, in response to defendant's objection during argument, the trial court reiterated that the comments made by counsel were not to be considered as evidence.

As to the victim's plea for mercy while on his knees, the evidence indicates that Rose was kidnapped and held against his will for four hours. Rose was eventually taken to a dark, distant, and fairly secluded location. It is not unreasonable to infer that in these circumstances, the victim would know he was about to be killed and would have pleaded for mercy. (See *People v. Bennett* (2009) 45 Cal.4th 577, 617 [88 Cal.Rptr.3d 131, 199 P.3d 535]; *People v. Navarette* (2003) 30 Cal.4th 458, 520 [133 Cal.Rptr.2d 89, 66 P.3d 1182].)

e. *Aggravating Evidence Outside the Record*

Near the outset of her penalty phase argument, the prosecutor stated, "You will recall during jury selection we talked about aggravating factors and mitigating factors. The law is very specific about what can be used. I cannot bring in every single bad thing this defendant has done throughout his entire life to convince you to give him the death penalty. I'm limited to [section 190.3,] factors (a), (b) and (c) up there on the chart."

Defendant points to the prosecutor's comment regarding "every single bad thing this defendant has done throughout his life." He asserts the prosecutor improperly informed the jury that defendant had committed other bad acts worthy of their consideration, but which were not admissible. He claims the prosecutor's misconduct violated his statutory rights under section 190.3 as well as various federal and state constitutional rights.

Defendant did not object to this argument and has forfeited his claim of error. Moreover, any error was harmless. The prosecutor's comment could be understood as defendant suggests. Jurors also could have understood the prosecutor as simply emphasizing the limited nature of the aggravating factors the jury could consider. Assuming defendant's interpretation is correct, he was not prejudiced. The comment was brief and ambiguous.

f. Caldwell *Error*

■ Near the end of the closing argument, the prosecutor addressed the argument that a jury, by imposing the death penalty, is "stooping to the level of the person who committed the murder." Arguing to the contrary, the prosecutor discussed the various rights that had been accorded defendant from the time of his arrest to the penalty phase of the trial. She then told the jurors that the victim had been given none of these rights and stated: "Even if you give this defendant the death penalty . . . he will never be in the same position Fred Rose was in on January 23rd. [¶] Now, perhaps you may hear argument on this, the gas chamber does not lend itself to a truly dignified death. But I submit to you, it's far better than down in the dirt alone with all

your brains oozing out, and what's more the defendant will have a chance to say goodbye and to make peace with his family and with his God if he has one. And if death is by lethal injection, we should all be able to end our lives in such a painless and non-intrusive manner. Either way, this defendant will never die the way Fred Rose did." Defendant argues that the prosecutor's reference to lethal injection as painless and nonintrusive diminished the jury's sense of responsibility for imposing the death penalty, in violation of the Eighth Amendment under *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] (*Caldwell*).[24] In *Caldwell*, the prosecutor's rebuttal argument indicated that the jury's decision to impose death would be reviewed by the Mississippi Supreme Court. The United States Supreme Court reversed the penalty determination, holding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Caldwell*, at pp. 328–329.) *Caldwell* is limited to comments " 'that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.' " (*Romano v. Oklahoma* (1994) 512 U.S. 1, 9 [129 L.Ed.2d 1, 114 S.Ct. 2004], quoting *Darden v. Wainwright* (1986) 477 U.S. 168, 184, fn. 15 [91 L.Ed.2d 144, 106 S.Ct. 2464].)

In asserting that the prosecutor's argument here was error under *Caldwell*, defendant relies on *Antwine v. Delo* (8th Cir. 1995) 54 F.3d 1357, in which the prosecutor argued: " 'Let there be no question, we are asking you to put this defendant to death. . . . [H]e will be taken into a room. There will be witnesses that will come down. There will be a priest present. He will be asked if he has any last request. . . . He will be put in a chair. A pellet will be dropped into acid, and when he inhales that, he would be put to death instantaneously.' " (*Id.* at p. 1362.) The *Antwine* court appeared troubled by what it perceived as an inaccuracy in the prosecutor's argument—that death was instantaneous once lethal gas was inhaled. The court, apparently going beyond the record, relied on three newspaper accounts of executions to suggest the prosecutor's argument was incorrect. (*Id.* at pp. 1361–1362.) Attempting to analogize the assurance of instantaneous death to the assurance of appellate review, the *Antwine* court stated: "[T]he jurors, faced with a very difficult and uncomfortable choice, will minimize the burden of sentencing someone to death by comforting themselves with the thought that the death would at least be instantaneous, and therefore painless and easy. The prosecutor's argument diminished the jurors' sense of responsibility for imposing the death penalty." (*Id.* at p. 1362.)

---

[24] Although defendant did not object to the prosecutor's argument at trial, he is not barred from making this claim on appeal because no objection was required at the time of defendant's trial. (*People v. Cleveland* (2004) 32 Cal.4th 704, 762 [11 Cal.Rptr.3d 236, 86 P.3d 302].)

The Eighth Circuit's decision is not binding upon this court. (See *People v. Williams* (1997) 16 Cal.4th 153, 190 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Nor do we find its reasoning persuasive. In *Caldwell*, the Supreme Court expressed concern that "the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." (*Caldwell, supra*, 472 U.S. at p. 333.) In *Antwine v. Delo, supra*, 54 F.3d 1357, jurors were *not* told that the authoritative determination of death lay elsewhere. Instead, the *Antwine* court reasoned that the prosecutor's argument minimized the jury's sense of responsibility for imposing a death sentence by suggesting that death would not be difficult or prolonged. (*Id.* at p. 1361.) The *Antwine* court plainly went beyond the *Caldwell* holding. Further, its reasoning is suspect. While jurors may feel relieved that they are not condoning gratuitous suffering, their decision over life and death remains a profound one. That decision is no less profound or burdensome because a less onerous mode of execution is employed.

Nevertheless, defendant argues that even if no *Caldwell* error occurred, the prosecutor's argument was still misconduct and violated defendant's state and federal constitutional rights to due process and a fair and reliable penalty determination. He points out there was no evidence in the record that lethal injection is painless and nonintrusive, and, in any event, such evidence would be inadmissible.

■ Neither party may offer evidence on the manner in which executions are carried out. (See *People v. Whitt* (1990) 51 Cal.3d 620, 644 [274 Cal.Rptr. 252, 798 P.2d 849]; *People v. Thompson* (1988) 45 Cal.3d 86, 138 [246 Cal.Rptr. 245, 753 P.2d 37]; *People v. Harris* (1981) 28 Cal.3d 935, 962 [171 Cal.Rptr. 679, 623 P.2d 240].) This limitation likewise restricts what advocates may argue. They certainly may not comment beyond the evidence, and any argument that appears to touch on the specifics of execution runs that risk. However, defendant has forfeited any claim of misconduct by not objecting, and does not persuade us that an admonition would not have cured any harm.

■ Alternatively, defendant asserts that trial counsel was constitutionally ineffective for failing to object. However, "deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Counsel reasonably could have decided that objecting would focus the jury's attention on the manner of death in ways that would not be helpful to the defense.

Moreover, defendant was not prejudiced. The prosecutor's brief comment must be considered in context. The prosecutor had contrasted the protections

accorded defendant with those given by defendant to the victim, and, continuing in the same vein, compared the immediate circumstances of the victim's death with those of defendant if lethally injected. Her point was that defendant's death would be less painful and intrusive than being shot in the head and left to die alone in the dirt. To the extent that the prosecutor's remarks could have been understood as arguing facts beyond the record, her passing reference to lethal injection played a minimal role in her argument. We find no reasonable possibility it affected the penalty determination.

### 5. *Instructional Error*

The trial court instructed the jury: "You are to be guided by the previous instructions given in the first phase of this case which are applicable and pertinent to the determination of penalty. [¶] To the extent that the instructions I am now giving to you conflict with my earlier instructions, today's instructions shall prevail. [¶] You are to completely disregard any instructions given in the first phase which had prohibited you from considering pity or sympathy for the defendant."

Defendant contends the trial court erred in failing to instruct the jury with the applicable guilt phase instructions, such as CALJIC No. 2.01 regarding the sufficiency of circumstantial evidence, and that this error violated his federal and state constitutional rights.[25]

During discussion of the proposed jury instructions, defense counsel did not request additional instruction and thus has forfeited his claim on appeal. (See *People v. Rogers* (2009) 46 Cal.4th 1136, 1175 [95 Cal.Rptr.3d 652, 209 P.3d 977].) Even if we were to reach defendant's claim, it is without merit because the court was not required to repeat the applicable guilt phase instructions. (*Ibid.*; *People v. Butler* (2009) 46 Cal.4th 847, 873 [95 Cal.Rptr.3d 376, 209 P.3d 596].) "[A] reasonable juror would assume that 'generic' instructions given at the guilt phase continue to apply at the penalty phase . . . ." (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1020 [30 Cal.Rptr.2d 818, 874 P.2d 248]; see also *People v. Rogers, supra,* 46 Cal.4th at p. 1175.)

Defendant also posits as error the trial court's use of the phrase "guided by" because it, in effect, told the jury that consideration of guilt phase instructions was elective rather than mandatory. Considering the phrase in context, this argument is meritless.

---

[25] Defendant relies on the Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, and 17 of the California Constitution.

### 6. *Trial Court's Grant of New Penalty Trial Motion*

The trial court granted defendant's motion for a new penalty trial based principally on juror misconduct. Jurors considered the relative positions of defendant and Rose at the time of the shooting. The trial court found that a juror's use of his home computer to make a diagram based on trial testimony and a demonstration by jurors in the deliberation room were prejudicial misconduct. The People appealed, and the Court of Appeal reversed the trial court's grant of a new penalty trial. There was no misconduct.

#### a. *Background*

##### (1) *Pertinent Trial Proceedings*

Dr. William Sherry, the forensic pathologist, testified during the guilt phase that the bullet entered the upper right rear of Rose's head and exited through the right forehead. The absence of stippling, tattooing and searing indicated the gun was at least 18 inches from Rose when it was fired, but could have been as far away as 100 feet. Dr. Sherry also noted that Rose had small abrasions on the left hand, a scratch on the right knee, an abrasion just below the knee, and a bruise on the left elbow. These injuries occurred while Rose was still alive.

The prosecutor asked Dr. Sherry if he had an opinion about the direction of the gunshot wound. In response, Dr. Sherry and the prosecutor engaged in the following colloquy:

"A. All I can say is assuming the body in the standard anatomic position, which means hands down at the side and standing and looking straight ahead, the gunshot wound in that particular position would be back to front, slightly left to right, and slightly downward.

"Q. When you say 'slightly downward,' that would mean that the person doing the shooting would have to be a little taller or hold a weapon a little over the head; is that correct?

"A. It would be consistent with that.

"Q. Would it also be consistent with perhaps two people who are the same size, but one person is kneeling which could account for the abrasion on the knee?

"A. It would be consistent with that."

On cross-examination, defense counsel and Dr. Sherry engaged in the following exchange:

"Q. Isn't it true that the anatomical position or the position of the person who has been shot, more precisely, has a great deal of impact upon the bullet track within the body?

"A. You mean the position of the head?

"Q. Yes.

"A. Yes. The head can be turned in any of a number of positions at that time that the gunshot was sustained so that with relationship to the rest of the body, the standard anatomic position may not apply.

"Q. It would be possible, would it not, for someone to have a wound with a downward track if, for example, that person's head was tilted backwards, for example, when the bullet struck the head.

"A. You are correct.

"Q. And there are probably millions of different possibilities depending upon the position of the weapon and the position of the body and specifically the head of the person who was struck?

"A. Yes."

In her closing argument at the penalty trial, the prosecutor discussed the circumstances of the crime under section 190.3, factor (a): "[Defendant] killed [sic] Fred Rose in the back of the head. When based on the evidence Mr. Rose was either on his knees pleading for mercy or running away from defendant—." Defense counsel objected and the trial court advised that the statements of counsel are not evidence. The prosecutor continued, "He executed this father of three and then went out and partied."

At the conclusion of the guilt phase the jury was admonished with CALJIC No. 1.03 as follows: "You must not make any independent investigation of the facts or the law or consider or discuss the facts as to which there is no evidence. This means, for example, that you must not on your own visit the scene, conduct experiments or consult reference works or persons for additional information." At the conclusion of the penalty phase, the jury was told it was to be guided by applicable and pertinent guilt phase instructions.

## (2) *Evidentiary Hearing*

After the jury's penalty verdict, defense counsel joined a conversation between the prosecutor and jurors and learned that deliberating jurors conducted a demonstration of the shooting, using a protractor and string. The jurors' comments were reported in the Los Angeles Times. Defendant filed a motion for a new trial based on jury misconduct. The trial court decided to conduct an evidentiary hearing rather than rely on declarations. Jurors G.B. and C.C. and Jury Foreperson W.B. testified, recounting events that occurred during the penalty phase deliberations.

We note at the outset that portions of the testimony elicited at the evidentiary hearing were inadmissible pursuant to Evidence Code section 1150, subdivision (a), which provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." During the hearing, no objections were made by the prosecutor or defense counsel on this basis.

Juror G.B. was questioned first. He noted Dr. Sherry's testimony about the bullet's entry and exit points and its downward trajectory. G.B. testified: "Well, I went over this. We had three months to think about this case and after having seen a lot of injuries during my tours of Vietnam, I know that that type of injury, and I had seen several, were only created by one of two ways and that was an execution type of shooting or an individual hit while being shot from helicopters or gunships which would give it the downward trajectory. So during deliberations, the term 'executed' was used on different occasions. This tended to upset one of the jurors and the question was asked how do you know? Well, on my computer, I worked out height patterns and came up with the fact that anyone standing six feet away from another person would have to just about be standing on a stool two and a half feet high to get a downward trajectory through the back of the skull of an individual . . . ." More specifically, G.B. explained: "I marked off six feet, two inches in the scale. I marked off five foot ten inches, and six feet, two inches referring to approximately the height of [defendant] and five foot, ten inches of the approximate height of Fred Rose. [¶] Then I separated the two approximately six feet in scale and used an angle of trajectory, slight downward angle of approximately five to seven degrees to give an approximate location where the person's hand would have to be in order to identify a weapon at that distance and at that angle." G.B. relied on trial testimony for defendant's height; Rose's height was noted in the coroner's report.

Juror G.B. explained that in the deliberation room the next day he conducted a demonstration with the assistance of Juror C.C. G.B. did not tell the jurors about his computer use, but relied on it "to back up the statements that were made in the deliberation room about an execution instead of a murder." C.C., who was about Rose's height, took the position of the victim. G.B. used a string from his jacket and a protractor, which G.B. found in the jury room. The jacket string was about six to eight feet long. G.B. stated: "For the string you could have substituted a piece of paper or yardstick. For the protractor somebody holding their hands straight out in a position such as [a] crucifix just to maintain a straight line."

The protractor was placed against Juror C.C.'s temple "at a slight downward angle as described by Dr. Sherry," at approximately five to 10 degrees. Juror G.B. testified they did not determine any angles and stated, "There was no testimony as to the degree of trajectory, absolutely none. We used what Dr. Sherry said, a slight downward angle." The string was positioned at the center of the protractor and held six feet away by G.B., who explained that six feet was used "because the closest footprints that were found by the investigating officers at the scene of Fred Rose's shooting were six feet away from Fred Rose." G.B. stated that the protractor was used only as a straightedge and not to measure specific angles. The demonstration was conducted with C.C. both standing and kneeling. G.B. testified that the diagram on the computer and the demonstration in the deliberation room were based solely on testimony received in court.

Juror C.C. testified that some of the jurors did not understand the evidence regarding the shooting. There were discussions one day and "the next day we were still discussing it." Jurors illustrated the shooting on the board, but no one could draw well so they "couldn't make sense out of it." C.C. said jurors "just wanted to visually see more." C.C. confirmed the demonstration as described by Juror G.B., although C.C. thought the protractor was used to show the particular angle. C.C. testified that the string was "six foot . . . something like that." C.C. did not recall any comment from any of the jurors about the significance of the six-foot length of string. During the demonstration, C.C. knelt and stood and moved his head as requested by the other jurors. He said that "everybody was looking at different things," and all the jurors were involved. C.C. was asked by the prosecutor if any jurors indicated their recollection of defense counsel's examination of Dr. Sherry. C.C. replied, "I think that's why everybody was asking different possibilities and not just one and we went through all the different possibilities." No one mentioned any outside research. C.C. testified the demonstration was based on what he heard in the courtroom, and he recalled that it only lasted a few minutes.

Foreperson W.B. recalled only that Juror G.B. stood with a string and a protractor while Juror C.C. knelt. G.B. was trying to "prove his point" that the victim was kneeling when shot. The reenactment was brief, but Foreperson W.B. did not recall any details. The position of the victim did not make a difference to W.B. He did not know where the protractor came from, and assumed G.B. provided the protractor and string. G.B. mentioned his knowledge of guns to jurors, but not his military experience. W.B. stated that G.B. did not bring any outside information into the jury room and the reenactment of the shooting appeared to be based on the trial testimony.

### (3) *Further New Trial Motion Issues*

After the three jurors testified, the trial court invited defense counsel to file a revised motion for new trial in light of testimony that the demonstration occurred during the penalty phase, and not the guilt phase as originally thought. Defense counsel subsequently filed a motion for a new penalty phase trial on the grounds of juror misconduct as well as prosecutorial misconduct.[26]

During a proceeding on another matter, the trial court noted receipt of briefing on the new trial motion. It invited additional points and authorities on three issues of concern to the court, including "comments made by the prosecution [during closing argument] calling for the exercise of vengeance."[27] Neither party filed points and authorities.

At the hearing on the new trial motion, the trial court stated that it was now additionally concerned that during closing argument the prosecutor had conveyed the family's desire for a death verdict. The prosecutor responded that she was not prepared to address this issue, which was newly raised by the court. The trial court also advised defense counsel to address testimony by prosecution witness Fred Joseph regarding other crimes alleged to have been committed by defendant. The trial court invited further briefing and the hearing was continued. No additional briefing was submitted.

---

[26] As to his claims of prosecutorial misconduct, defense counsel argued that the juror misconduct was arguably precipitated by the prosecutor's appeal to the jury's passions in her closing argument when she argued that Rose "may have been on his knees pleading for mercy"; her request that the jury show defendant the same mercy he showed Rose; and her invitation to the jury to imagine the fear and pain experienced by Rose as he lay on the ground for two hours until discovered by the jogger.

[27] The other issues identified by the trial court were the prosecutor's references to executions as painless and nonintrusive, and the manner in which the court should evaluate victim impact evidence as a circumstance of the crime under section 190.3, factor (a).

### (4) *Trial Court's Ruling*

At the continued hearing on the motion for a new trial, the trial court addressed three issues which it identified as follows: (1) juror misconduct based on improper experiments; (2) argument by the prosecutor that the victim's family preferred the death penalty; and (3) evidence about other crimes committed by defendant, disclosed during unforeseen "outbursts" by witness Fred Joseph. The trial court concluded that "[f]or each and all of the foregoing reasons, the defense motion for a new trial as to the penalty phase only is granted."

With regard to jury misconduct, the trial court determined that Juror G.B., as a result of his experience in the Vietnam War, had a "strongly held belief" that the type of injury suffered by Rose could have resulted only from an execution-style killing or a shot fired from a helicopter. The court stated that G.B. performed on his home computer "what can only be described as a simulation model from which he concluded that his preconceptions were in fact correct . . . ." The court stated further, "Having gathered and developed this information outside the jury room, [G.B.] then . . . proceeded to duplicate the experiment inside the jury room by posing different jurors in the role of victim and executioner." The court found that, although the manner in which the protractor got into the jury room was unknown, angles were discussed and "a difference between five degrees in an angle would have an impact on distance and the number of feet and the circumstances of the offense. This is a type of experiment that would not be allowed in open court without a proper foundation being laid. No such foundation could be laid in the jury room and this evidence . . . that was brought into the jury room and created in the jury room was not subject to cross-examination or confrontation of any kind. But perhaps even of greater difficulty is the ultimate fact that the creation of this experiment gave the impression of scientific certainty and took a set of circumstances that were an arguable possibility and gave them the imprimatur of scientific truth." The court stated that the jury's conclusion "seemed to have been motivated by their observation that footprints were found six feet away and this experiment confirmed the magic figure of six feet." The court noted that Detective Castillo clarified that the closest distance of the Nike shoe prints to the blood pool was 15 feet.

The trial court found a substantial likelihood "that the improper consideration of this evidence influenced the outcome of the jurors' decision." It noted the testimony at the evidentiary hearing indicating the manner of killing was an issue of concern during deliberations, and that jurors reported the experiment "as a salient feature when they spoke about the case immediately following the recording of the verdict." Additionally, the court stated that the jury developed and considered information regarding an execution-style killing in the context of the prosecutor's argument regarding vengeance and

retaliation. Thus, "it was logical for jurors to look at the question of whether or not there should be an execution in exchange for an execution . . . ."

### (5) *Court of Appeal Ruling and Petition for Review*

The People appealed and the Court of Appeal reversed the order granting defendant a new penalty trial and reinstated the jury verdict fixing the penalty at death.[28] The court first determined that the jury room demonstration was not misconduct because "there was nothing improper about the demonstration, nor did it involve any improper outside evidence." The court noted that "all the factual assumptions explored by the demonstration were well within the evidence," and observed that even if the protractor was used to demonstrate angles, that effort was no different from using a ruler to mark linear measurements.

As to Juror G.B.'s use of his home computer, the Court of Appeal stated the People "concede [it] was technically misconduct," but not prejudicial.[29] The court accepted the People's concession without discussion and agreed that no prejudice resulted. The court stated: "First, the juror never mentioned his use of his home computer to other jurors. Thus, its use had no effect on other jurors and did not in any way enhance the opinion of the offending juror. Second, there was no evidence the offending juror obtained information from the computer or did computations he otherwise could not have done. While he used the computer to draw the heights and distances to scale, the drawing was nothing more than he could have done on paper or on the blackboard. Third, the offending juror used the computer only to help himself visualize the relative positions of Rose and Collins. Some jurors were unsure about the prosecutor's argument that Collins essentially executed Rose while Rose was on his knees or running away. The offending juror already agreed with the argument, and merely used the computer to help him visualize his thoughts to more effectively persuade his fellow jurors. Finally, the evidence against Collins was strong. Thus, the technical misconduct was not prejudicial, and the trial court abused its discretion in granting a new penalty trial on this record."

---

[28] The Court of Appeal reversed only on the basis of the trial court's conclusions regarding the jury experiment. The Court of Appeal noted the parties' additional arguments as to the other two grounds on which the trial court granted a new penalty trial—prosecutorial misconduct during the penalty phase argument and the erroneous admission of evidence regarding defendant's other crimes. However, the Court of Appeal stated it need not address those arguments because "[t]he trial court did not rely on those grounds in granting [defendant] a new penalty trial." The Court of Appeal did not explain the basis for this conclusion.

[29] In briefing in the Court of Appeal, the People stated: "[T]he use of a computer to continue deliberating outside the presence of his fellow jurors was juror [G.B.'s] only vice."

Defendant sought review in this court on the issue of juror misconduct. We denied review without prejudice to subsequent consideration after judgment.

Defendant now asserts that both Juror G.B.'s computer use and the demonstration in the deliberation room were misconduct, violating his rights to trial by jury, to confront witnesses, and to a reliable penalty determination.[30] Respondent states that G.B.'s home computer use was "arguably improper" as a violation of the trial court's order not to conduct an independent investigation, but maintains that the juror's computer use was based on the evidence and "merely allowed him to visualize his beliefs." Respondent contends that the jurors' demonstration in the deliberation room was not misconduct.

### b. *Analysis*

Under section 1181, items 2 and 3, the trial court may grant a new trial when "the jury has received any evidence out of court, other than that resulting from a view of the premises, or of personal property" (§ 1181, item 2), or the jury has "been guilty of any misconduct by which a fair and due consideration of the case has been prevented" (§ 1181, item 3).

We first determine whether there was any juror misconduct. Only if we answer that question affirmatively do we consider whether the conduct was prejudicial. (*People v. Danks* (2004) 32 Cal.4th 269, 303 [8 Cal.Rptr.3d 767, 82 P.3d 1249].) In determining misconduct, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." (*People v. Nesler* (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87].) Here, the historical facts regarding Juror G.B.'s computer use and the deliberation room demonstration are essentially undisputed. The inquiry is whether those facts constitute misconduct, a legal question we review independently.[31]

The trial court described Juror G.B.'s computer use and the deliberation room demonstration as improper experiments in which G.B. and the other

---

[30] Defendant relies on the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and article I, sections 7, 15, 16, and 17 of the California Constitution.

[31] Defendant, relying on *People v. Ault* (2004) 33 Cal.4th 1250 [17 Cal.Rptr.3d 302, 95 P.3d 523], argues that we must apply a deferential standard in reviewing the trial court's grant of a new trial motion. In *Ault*, we expressly confined our analysis to the prejudice component of the trial court's ruling, stating: "We have emphasized that the *existence* of misconduct is essentially *undisputed* in this case, and that the People's only complaint on appeal is with the trial court's determination of resulting *prejudice*. . . . Accordingly, we *need not and do not* consider whether a more stringent standard of review might apply to a trial court's determination of *error* leading to its decision to grant a new trial, where the claim of error involved a mixed law and fact issue." (*Id.* at p. 1267, fn. 9.)

jurors "created" evidence that was not subject to confrontation and cross-examination. The trial court's characterization of these events is incorrect. Neither G.B.'s consideration of the evidence at home nor the jurors' demonstration in the deliberation room resulted in the acquisition of new evidence.

■■■ This court established the framework for analysis of a jury misconduct claim based on experimentation nearly a century ago in *Higgins v. L. A. Gas & Electric Co.* (1911) 159 Cal. 651 [115 P. 313] (*Higgins*). Justice Hinshaw explained: "It is a fundamental rule that all evidence shall be taken in open court and that each party to a controversy shall have knowledge of, and thus be enabled to meet and answer, any evidence brought against him. It is this fundamental rule which is to govern the use of exhibits by the jury. They *may use* the exhibit according to its nature to aid them in weighing the evidence which has been given and in reaching a conclusion upon a controverted matter. They *may carry out experiments* within the lines of offered evidence, but if their experiments shall invade new fields and they shall be influenced in their verdict by *discoveries* from such experiments which will *not fall fairly within the scope and purview* of the evidence, then, manifestly, the jury has been itself *taking evidence* without the knowledge of either party, evidence which it is not possible for the party injured to meet, answer, or explain." (*Id.* at pp. 656–657, italics added.)

The *Higgins* court cited with approval, and by way of example, two contrasting cases. (*Higgins, supra,* 159 Cal. at pp. 657–659.) In *Wilson v. U.S.* (9th Cir. 1902) 116 Fed. 484, the defendant was charged with smuggling opium prepared for smoking. A sample of the smuggled drug was admitted at trial, but the prosecution offered no evidence that it had been prepared for smoking, nor did it explain how the jury could resolve that question. After the presentation of evidence, the trial court instructed the jury that it could test the opium to determine whether it would burn, and thus determine whether the opium was prepared for smoking. This instruction was improper. Whether the opium had been prepared for smoking was an essential element of the crime that was not proven by the prosecution. " 'Yet the jury was left to determine that essential fact for themselves, by experiment . . . .' " (*Higgins, supra,* 159 Cal. at p. 658, quoting *Wilson v. U.S., supra,* 116 Fed. 484.)

Conversely, in *Taylor v. Commonwealth* (1893) 90 Va. 109 [17 S.E. 812], in which defendant was charged with murder, evidence showed that expended cartridges at the scene had been fired from a Winchester rifle of a given caliber and that defendant had such a rifle. The defendant responded by introducing his rifle and four empty shells that had been fired from it. He contended that his gun was not the murder weapon because the marks made by the firing pin on the four shells were different from the marks on the

expended cartridges recovered at the scene. During trial the rifle was exhibited, but not taken apart. In deliberations the jurors dismantled the rifle, examined the firing pin, and concluded it had been tampered with. The *Higgins* court agreed with the Virginia Supreme Court that the jurors' examination was proper. The jury examined the rifle to weigh the evidence that had been given. The question of whether defendant's rifle had fired the shells recovered at the scene was squarely raised. Their examination of the gun did not invade a new field and fairly fell within the scope and purview of the evidence received. The *Higgins* court observed: "A more acute prosecuting attorney might have caused the examination to have been made in open court and thus have demonstrated the trick and fraud, but his failure to do so afforded no ground for overthrowing the verdict of an intelligent and scrutinizing jury which, making its own examination of the evidence admitted to prove or disprove the very fact, discovered that the [firing pin] 'had been . . . tampered with and fixed for the occasion of the trial.' " (*Higgins, supra,* 159 Cal. at pp. 658–659, quoting *Taylor v. Commonwealth, supra,* 17 S.E. 812.)

In contrasting the two cases, the *Higgins* court noted that in the opium case, the jury conducted an experiment by which it gathered evidence not presented in court. (*Higgins, supra,* 159 Cal. at p. 659.) In the rifle case, the jury "merely subjected an exhibit to a more critical examination than had been made of it in court and by such examination reached a conclusion upon a contested fact by a more careful scrutiny . . . ." (*Ibid.*) In other words, under the rule established by *Higgins,* the jury's experiment in the opium case invaded a new field of inquiry. In the rifle case, the jury's examination of the gun did not invade a new field, but rather fell within the scope and purview of the evidence received. (See *id.* at p. 656.)

In the century since *Higgins,* numerous cases have reiterated the distinction between an experiment that results in the acquisition of new evidence, and conduct that is simply a "more critical examination" of the evidence admitted. The former is misconduct; the latter is not.

In *People v. Cooper* (1979) 95 Cal.App.3d 844 [157 Cal.Rptr. 348] (*Cooper*), officers testified they were driving down the street when they saw Cooper look over his shoulder in their direction, reach into his waistband and toss a shiny object onto a lawn about 15 feet away. The officers stopped Cooper and recovered the item, which was a bag of heroin. Cooper testified he had not possessed the drug and had not thrown the bag. As part of a motion for a new trial, the defense contended the jury committed misconduct when it reenacted the officers' testimony and demonstration of how the bag had been thrown. In rejecting the misconduct argument the *Cooper* court noted: "It is clear . . . that experiments by the jury are prohibited *only* where

the result is the production of 'new' evidence. [Citation.] . . . The general rule is that the jurors may engage in experiments which amount to no more than a careful examination of the evidence which was presented in court. [Citation.]" (*Id.* at pp. 853–854, italics added.) The Court of Appeal then concluded that the jury reenactment was not misconduct because the experiment did not produce new evidence: "During the trial, [the officer] had demonstrated the manner in which defendant had thrown the contraband. The jurors simply repeated the officer's reenactment. Nothing requires that the jury's deliberations be entirely verbal, and we would expect a conscientious jury to closely examine the testimony of the witnesses, no less so when that testimony takes the form of a physical act. There was no error in denying the motion for new trial on this ground." (*Id.* at p. 854.)

*Wagner v. Doulton* (1980) 112 Cal.App.3d 945 [169 Cal.Rptr. 550] was a personal injury case arising from a car accident. In support of a motion for a new trial, two jurors submitted affidavits stating that one of the jurors, an engineer, prepared a scale map of the accident scene and the vehicles involved, which was shown to the other jurors. (*Id.* at p. 947.) In response, the juror in question also submitted an affidavit, declaring that he prepared a diagram of the accident scene only from information presented in court, contained in his notes or based on his memory. (*Ibid.*) In affirming the denial of a new trial, the Court of Appeal held that while "jurors may not receive evidence out of court and may not conduct experiments *which put them in possession of evidence not offered at trial* [citations] it is not misconduct for a juror to make a diagram in the jury room based solely on the evidence received in court. Nor should the fact that a juror is an engineer and perhaps more skillful at drawing make any difference." (*Id.* at p. 950, italics added.) The juror did not act improperly because his diagram did not introduce any new evidence. Instead, the "pictorial representation" of the juror's idea of the testimony merely constituted an examination of the evidence that had been received. (*Id.* at p. 951.)

In *People v. Cumpian* (1991) 1 Cal.App.4th 307 [1 Cal.Rptr.2d 861] (*Cumpian*), the defendant was charged with robbery. A security guard testified that he saw the defendant take a duffel bag from a store, put other property inside, and leave without paying. The guard approached the defendant in the parking lot and asked him to return to the store. The duffel bag hung at the defendant's side from a strap around his neck. The defendant swung "a large safety pin" at the guard and fled. (*Id.* at p. 310.) A police officer chased and arrested defendant, finding the bag still hanging from his neck and the safety pin, with keys attached to it, lying at his feet. The defense argued that the crime was a petty theft, not a robbery. The defendant testified that he merely reacted when someone grabbed his arm, and did not intend to injure the guard. He ran because he was embarrassed. He had tried to drop the bag but could not do so because it was "tightly strapped to his body." (*Ibid.*)

During deliberations, jurors examined the duffel bag and its contents, which were admitted in evidence. Several jurors carried the bag as witnesses had described to determine how easily it could be removed. The defendant sought a new trial alleging juror misconduct based on an "unlawful experiment." (*Cumpian, supra*, 1 Cal.App.4th at p. 311.)

The Court of Appeal framed the issue as follows: "The question is whether the jury, in attempting to replicate the position of the bag on defendant's shoulder while in the jury room, received *extrinsic* evidence or was subjected to an *outside* influence." (*Cumpian, supra*, 1 Cal.App.4th at p. 313.) It held there was no misconduct, explaining its reasoning as follows: "Here, the jury's use of the exhibit did not invade new fields nor did their experiment with the duffel bag involve matters not within the scope and purview of the evidence. In fact, the declarations state that the jury used the exhibit in a similar fashion to that testified to and demonstrated by [the security guard.] It is not the use of the exhibit which creates misconduct but its use in some manner *outside the offered evidence*." (*Id*. at p. 315, italics omitted & added.)

Relying on *Higgins, supra*, 159 Cal. 651, and *Cooper, supra*, 95 Cal.App.3d 844, the *Cumpian* court concluded: "[I]t is clear the concept of the receipt of evidence out of court entails evidence not presented during the trial . . . . The jury's reenactment of [the evidence presented at trial] did not constitute the receipt of evidence out of court, but was merely an experiment directed at proffered evidence." (*Cumpian, supra*, 1 Cal.App.4th at p. 316.) "[N]ot every [jury] experiment constitutes . . . misconduct. '[J]urors must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdicts. [Citations.]' (*United States* v. *Avery* (6th Cir. 1983) 717 F.2d 1020, 1026.) To prohibit jurors from analyzing exhibits in light of proffered testimony would obviate any reason for sending physical evidence into the jury room in the first instance." (*Ibid*.) An evaluation of a misconduct claim "must necessarily focus on whether the experiments were based on evidence received in court." (*Id*. at p. 317.)

Similarly, in *People v. Bogle* (1995) 41 Cal.App.4th 770 [48 Cal.Rptr.2d 739] (*Bogle*), the jury's closer analysis of a trial exhibit was not misconduct. The defendant in *Bogle* was accused of murdering a husband and wife with whom he lived. The victims' safe and the defendant's keys were admitted into evidence. The defendant testified and identified the lock each key would open, but never said that any of the keys opened the safe. During deliberations, the jury inserted one of the keys into the safe and unlocked it. Defendant moved for a mistrial, arguing that the jurors had conducted a prohibited experiment. The trial court disagreed and denied his motion.

On appeal, defendant relied on *Higgins, supra*, 159 Cal. 651, to characterize the jury's conduct as an experiment invading a " 'new field' " not

presented at trial. (*Bogle, supra,* 41 Cal.App.4th at pp. 779, 781.) The Court of Appeal rejected this argument. It noted that the keys and the safe were both properly introduced into evidence and given to the jury for examination. It stated: "Contrary to the defendant's implication, the term 'field,' as used in *Higgins,* does not mean one specific fact. A 'field,' instead, is an area of inquiry, such as the extent of the defendant's access to the contents of the safe or whether the defendant was a credible witness." (*Bogle, supra,* 41 Cal.App.4th at p. 779.) "[T]he jury here did not consider new evidence. While the jurors reexamined the evidence in a slightly different context, it was within the 'scope and purview of the evidence' presented . . . and did not invade a new field. (*Higgins* . . . , *supra,* 159 Cal. at p. 657.) This careful scrutiny of the evidence was not a prohibited experiment." (*Id.* at p. 781; see also *People v. Baldine* (2001) 94 Cal.App.4th 773, 778 [114 Cal.Rptr.2d 570] [finding no misconduct when jurors turned on defendant's police scanner admitted in evidence, rebutting defendant's claim it was not working].)

These cases of proper jury behavior are easily distinguished from those cases in which misconduct occurred. *People v. Conkling* (1896) 111 Cal. 616 [44 P. 314] (*Conkling*) involved a murder in which the distance between the shooter and the victim was a "vital issue in the case." (*Id.* at p. 627.) The victim's clothing, admitted in evidence, showed no powder burns. During trial, two jurors "borrowed a rifle similar to that with which the deceased was killed, bought some cotton drilling, retired to the outskirts of the city, and there made experiments by firing the rifle, for the purpose of determining at what distance powder marks would be carried by the fire." (*Ibid.*) We concluded: "Jurors cannot be permitted to investigate the case outside the courtroom. They must decide the guilt or innocence of the defendant upon the evidence introduced at the trial." (*Id.* at p. 628.) Later, we described the circumstances of *Conkling* as "a clear case of the jury's obtaining evidence by unauthorized experiments made without the presence and knowledge of the defendant." (*Higgins, supra,* 159 Cal. at p. 659.)

In *People v. Castro* (1986) 184 Cal.App.3d 849 [229 Cal.Rptr. 280] (*Castro*), a defendant was found guilty of arson and other offenses resulting from a riot at a county jail. A correctional officer, standing 50 to 100 yards away, used binoculars to identify the defendant as a participant in the arson. During deliberations, a juror " 'went home and used binoculars to see if [the officer] could have possibly seen what he . . . said he did.' " (*Id.* at p. 852.) The juror then reported his finding to the other jurors. (*Ibid.*) The trial court denied the defendant's motion for a new trial based on juror misconduct. The Court of Appeal reversed, describing the juror's actions as an improper experiment. There was no showing that the juror's binoculars were similar to those used by the officer or that the lighting conditions and distances were similar to the conditions at the time of the officer's observation. (*Id.* at pp. 853–854.) The Court of Appeal concluded that the juror's experiment

"enabled [him] to receive evidence outside the presence and knowledge of [the] appellant going to the crucial element in the . . . case, the identity of the appellant." (*Id.* at p. 854.)

In *Bell v. State of California* (1998) 63 Cal.App.4th 919 [74 Cal.Rptr.2d 541], the plaintiff claimed he was falsely arrested. He testified that police officers grabbed his arms and held his wrists, "behind his back up to his neck," forcing him to bend over and stand on his toes. (*Id.* at p. 925.) He testified that officers forced him to walk down the stairs and out of the building in this position. (*Ibid.*) The trial court did not permit a recreation of the actual hold during trial because of risk of injury. (*Id.* at p. 932.) During deliberations one of the jurors advised the others that she and a third party had tried to replicate the manner in which the plaintiff said he was held by police. The juror reported that she fell over, leading her to disbelieve the plaintiff's testimony. (*Id.* at p. 930.) The Court of Appeal affirmed the trial court's grant of a new trial motion based upon juror misconduct and quoted the trial court: " 'The incident the juror was attempting to replicate is not subject to experimentation because of the inability to accurately duplicate critical factors such as the size, strength and height of the individuals, the amount of force involved, and the specific or unusual physical characteristic of each individual involved.' " (*Id.* at p. 932.) " '[T]his particular experiment would not have been within the lines of offered evidence even had it been conducted *in* the jury room with all twelve jurors present. The fact that the experiment was performed by one juror, aided by unknown third parties, outside of the court room and the deliberations, is more egregious and resulted in outside influences or extrinsic evidence permeating the jury's deliberation on perhaps the key factual determination in the case.' " (*Id.* at p. 933, italics added.)

The cases above concerned juror experiments conducted outside the deliberation room. In *Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724 [286 Cal.Rptr. 435] (*Smoketree*), the court addressed jurors' consideration of extraneous information while they deliberated. A condominium association sued a developer for damages arising from faulty concrete and grading work in the complex. Evidence was presented during trial that concrete slabs were improperly constructed. (*Id.* at pp. 1730–1731.) During deliberations, a juror created a model of a concrete foundation with a small box, kitty litter and some crayons she brought into the deliberation room. She told fellow jurors she was knowledgeable about concrete construction and used the model to explain how concrete is poured onto sand slabs. In the course of her demonstration, she explained that defects in the concrete could be caused by persons walking across the building slabs and leaving foot impressions before the concrete is poured. (*Id.* at pp. 1745–1746 & fn. 16.)

The Court of Appeal referred to *People v. Cooper, supra,* 95 Cal.App.3d 844, in which jurors reenacted the police officer's demonstration of how a bag of drugs was thrown. The *Smoketree* court stated: "Here, unlike the *Cooper* case where the jurors merely duplicated a demonstration presented at trial, [the juror] presented a new demonstration (i.e., there was no kitty litter and crayola demonstration conducted by any of the experts in the case). Further, when [the juror] conducted the demonstration, she represented she had special knowledge about concrete practices" and presented new evidence regarding inconsistencies in the sand. (*Smoketree, supra,* 234 Cal.App.3d at p. 1749.) "[The] [d]eveloper had no opportunity to challenge the accuracy of [the juror's] demonstration nor her representations of special knowledge about concrete practices." (*Ibid.*) The Court of Appeal concluded the juror's demonstration constituted misconduct because it introduced new evidence into the deliberations. (*Ibid.*)

 From the venerable authority of *Higgins* and its progeny, several principles emerge. Not every jury experiment constitutes misconduct. Improper experiments are those that allow the jury to discover *new* evidence by delving into areas not examined during trial. The distinction between proper and improper jury conduct turns on this difference. The jury may weigh and evaluate the evidence it has received. It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing all reasonable inferences. It may reexamine the evidence in a slightly different context as long as that evaluation is within the " 'scope and purview of the evidence.' " (*Bogle, supra,* 41 Cal.App.4th at p. 781.) What the jury cannot do is conduct a new investigation going beyond the evidence admitted.

 Before we apply these principles here, we emphasize the confines of the evidence we may properly consider in determining whether juror misconduct occurred. "[W]hen a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 415 [272 Cal.Rptr. 803, 795 P.2d 1260].) However, in conducting that hearing, the trial court "must take great care not to overstep the boundaries set forth in Evidence Code section 1150." (*Id.* at p. 418.) Evidence Code section 1150 "distinguishes 'between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved . . . .' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1261 [120 Cal.Rptr.2d 432, 47 P.3d 225].) " 'The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration.' " (*Ibid.*)

The evidentiary hearing in this case consisted not only of descriptions of G.B.'s home computer use and the jury demonstration in the deliberation room, but also juror opinion, conclusions drawn by others about jurors' states of mind or level of understanding, and the particular significance jurors attached to the evidence at trial. These were improper intrusions into the subjective reasoning process of the jurors in violation of Evidence Code section 1150. (*People v. Steele, supra*, 27 Cal.4th at p. 1261.) As to the testimony of the three jurors, no objections were interposed by either the prosecution or defense on the ground that testimony was inadmissible under Evidence Code section 1150. Nor did the trial court otherwise enforce the limitation of section 1150. Thus, the court repeatedly received testimony regarding the subjective reasoning process of the jurors. In conducting our review, we limit our consideration to the overt acts reflected in the testimony. (See *Steele*, at p. 1261.)

We turn first to the jurors' conduct in the deliberation room. Dr. Sherry testified that Rose was shot at a distance of 18 inches to 100 feet, with the bullet travelling through the skull, from back to front, slightly left to right.[32] Rose's injuries were consistent with the victim's being shot from above while kneeling. The victim's head also could have been tilted backward when the bullet entered the skull. The victim's injuries were consistent with myriad possibilities depending upon the position of the gun and the victim's head. In her closing argument, the prosecutor argued that defendant "executed" the victim by shooting Rose in the back of the head while he was on his knees or running away.

The overt acts described at the evidentiary hearing were as follows: Following discussion about the manner in which Rose was killed and after efforts to illustrate the shooting on the board, Juror G.B., with assistance from Juror C.C., attempted to demonstrate how Rose sustained a wound with a downward trajectory. G.B., who was similar in height to defendant, stood as the shooter, and C.C., who was similar in height to Rose, took the position of the victim. A six- to eight-foot string from G.B.'s jacket was held in place at C.C.'s temple by a protractor.[33] There was no discussion regarding the use of the six-foot distance. The protractor was used either as a straight edge to hold the string or to measure the angle. The string was pulled back and upwards by G.B. at a five-to-10 degree angle to show the path of the bullet. The demonstration was performed with C.C. kneeling and standing, and with his head in different positions, including tilted backward. C.C. changed

---

[32] Dr. Sherry identified two autopsy photographs, admitted in evidence, showing the entry and exit wounds.

[33] The trial court found only "that we don't know how the protractor came into the jury room."

positions as requested by the jurors. In response, he and G.B. demonstrated "different possibilities and not just one."

The trial court concluded that the jurors had conducted an "experiment" for which there was no foundation. The court analogized the jury's actions to those of the juror in *Castro*, *supra*, 184 Cal.App.3d 849, who went home and used binoculars to test whether the corrections officer could have seen the events he claimed he witnessed. The Court of Appeal in *Castro* observed that there was no showing that the juror's binoculars were similar to those used by the officer or that the lighting conditions and distances were similar to the conditions at the time of the officer's identification, and thus the juror's experiment resulted in the receipt of evidence beyond the record. (*Castro*, *supra*, at pp. 853–854.) The trial court here stated: "[W]hat occurred in this case is of far more moment and calls for greater caution, it calls for greater scientific technical evidence than the mere examination of a distance through a binocular lens." The court further stated: "The creation of this experiment took a set of circumstances that were an arguable probability and gave them the imprimatur of scientific truth."

Although the trial court's reasoning is a bit opaque, it appears to have equated the jury's selection of certain variables as the receipt of new evidence. Apparently referring to Dr. Sherry's testimony that there were many possible positions of the shooter and victim, the trial court stated that the manner of Rose's shooting presented "innumerable variables." The court expressed concern that "angles were discussed," given that Dr. Sherry did not mention a specific angle. The court also faulted the use of a six-foot distance between the shooter and victim because Detective Castillo had indicated that defendant's closest shoe print was 15 feet from the pool of blood where Rose's body was found.

The court's conclusions regarding the demonstration are not supported by the record. Unlike the jury conducting improper experiment in *Castro*, *supra*, 184 Cal.App.3d 849, the jury here did not go beyond the record in its attempt to evaluate the trial evidence. The manner in which Rose was killed was placed in issue as a circumstance of the crime under section 190.3, factor (a). None of the variables relied upon by the jury were outside the scope of the evidence. Dr. Sherry testified to a slight downward angle of trajectory for the bullet's path and the two autopsy photos showed the entry and exit locations in Rose's skull. The jury's use of a seven-to-10-degree angle for the trajectory reflected its interpretation of Dr. Sherry's description of a slight downward angle. The heights of the victim and defendant were in evidence. Juror G.B. recalled Detective Castillo testifying that defendant's shoe print was six feet from the blood pool. Even if G.B.'s recollection was erroneous, the six-foot distance was within the range of Dr. Sherry's testimony based on the ballistics

evidence. Moreover, there was no evidence that the shoe print represented the point at which defendant fired the gun. There was ample evidence that the areas close to Rose's body had been walked over by many at the scene. As the Court of Appeal noted, "[A]ll the factual assumptions explored by the demonstration were well within the evidence."

Within the range discussed by Dr. Sherry and the variety of possible physical positions, jurors conducted a demonstration to evaluate alternatives that could have produced the downward trajectory of Rose's wound. The jurors directed Juror C.C. to assume various positions. They specifically examined the prosecution's theory that Rose was "executed" while on his knees, and also considered whether Rose was shot while standing with his head tilted back. Their evaluation critically considered the evidence presented. It did not invade a new field. (See *Higgins, supra*, 159 Cal. at p. 657.)

The conduct of Juror G.B. at home requires a different analysis. Defendant argues that G.B. used his computer to create a model that allowed him to determine, under his interpretation of the evidence, the relative positions of the shooter and victim. He describes G.B.'s computer use as an improper experiment that provided him with new facts, and thus violated the trial court's admonition not to conduct experiments or independently investigate facts. As we shall explain, defendant mischaracterizes G.B.'s conduct. G.B.'s use of his computer was simply his own permissible thinking about the evidence received, and was not an experiment resulting in the acquisition of any new facts.

When Juror G.B. used his computer, he had already formed the opinion that defendant must have been on his knees when he was shot.[34] Based on his recollection of the evidence received, G.B. used his computer to diagram the positions of defendant and Rose in order to visualize how Rose suffered his particular wound. G.B. "marked off six feet, two inches in the scale" for defendant, and five foot ten inches for Rose. He separated them by approximately six feet. He employed a five-to-seven degree angle for the downward angle of the gun held by the shooter.

---

[34] The trial court stated that Juror G.B.'s computer use verified his "preconceptions" about the manner in which the victim was killed. The record does not indicate that G.B. had any improper "preconceptions." G.B. was aware from his experience in the Vietnam War that the kind of injury sustained by Rose could be inflicted in an execution. Jurors' views of the evidence are necessarily informed by their life experiences. (*In re Malone* (1996) 12 Cal.4th 935, 963 [50 Cal.Rptr.2d 281, 911 P.2d 468].) But there is no indication that G.B.'s Vietnam experience resulted in any "preconceptions" about the evidence. The record at the evidentiary hearing indicates that G.B. carefully evaluated Dr. Sherry's testimony. When the prosecutor noted that G.B. was able to relate Dr. Sherry's testimony almost verbatim, G.B. responded that the testimony "stuck in my mind like a peanut butter sandwich to your belly."

Juror G.B.'s scale diagram did not interject any information outside the record. G.B. relied on the coroner's report for Rose's height, and trial testimony for defendant's height. The distance separating the two men was within the range given by Dr. Sherry. G.B. used a five-to-seven degree angle to comport with Dr. Sherry's testimony that the trajectory of the bullet was "slightly downward." The visualization afforded by the diagram allowed G.B. to confirm his view that the bullet trajectory showed that defendant shot Rose while standing above him, a scenario acknowledged by Dr. Sherry during trial. The diagram did not provide any new evidence.

Nor was Juror G.B.'s conduct improper because it occurred outside the presence of other jurors. The diagram assisted him in thinking about the evidence at a time when he was permitted to form an opinion about the case. He was not limited to thinking about the case in the deliberation room. As we observed in *People v. Ledesma* (2006) 39 Cal.4th 641 [47 Cal.Rptr.3d 326, 140 P.3d 657]: "Jurors must be admonished not to form an opinion concerning the case or to discuss it with anyone before it is submitted to them. (§ 1122.) Once the case has been submitted to the jurors for decision, they may not deliberate except when all are together. (§ 1128.) Although the deliberation process of course includes thinking, defendant has failed to cite any authority suggesting that jurors must be directed not to think about the case except during deliberations. A juror participates in the deliberative process by 'participat[ing] in discussions with fellow jurors by listening to their views and by expressing his or her own views.' (*People v. Cleveland* (2001) 25 Cal.4th 466, 485 [106 Cal.Rptr.2d 313, 21 P.3d 1225].) Indeed, it would be entirely unrealistic to expect jurors not to think about the case during the trial and when at home." (*Id.* at p. 729.)

The Court of Appeal's opinion in *Bormann v. Chevron USA, Inc.* (1997) 56 Cal.App.4th 260 [65 Cal.Rptr.2d 321] (*Bormann*) is instructive. In *Bormann*, one of the deliberating jurors prepared "a statement, or notes, of her view of the evidence" during a weekend recess. (*Id.* at p. 262.) When the jury reconvened, the juror read to the jury her typewritten statement, "which comprised a strong argument, from the evidence, against Chevron's having been negligent. The statement contained no facts that had not been elicited at trial. The writing apparently was not read by any other jurors, nor did it become part of the record." (*Ibid.*) The trial court denied the defendant's motion for a new trial. The Court of Appeal affirmed.

The Court of Appeal observed that "the written statement that Juror C. read comprised her own views of the evidence, albeit arranged and transcribed at home, during a weekend separation of the jury." (*Bormann, supra*, 56 Cal.App.4th at p. 262.) The court observed that "[a]ppellant's argument of misconduct hinges squarely on the circumstance that the juror

composed her thoughts, and her writing, outside the jury room. Appellant contends that both forms of conduct constituted forbidden deliberation outside the presence of the whole jury. But the notion that a juror may not think about the case out of court after it has been submitted is not only impracticable but also legally inaccurate." (*Ibid.*) The court noted that Code of Civil Procedure section 611, reflected in BAJI No. 15.40, provides in relevant part that when jurors are permitted to separate, either before or after submission of the case, they must be instructed that it is their duty " 'not to form or express an opinion thereon until the case is finally submitted to them.' Thus, the code provides that following submission jurors may, as they must, form opinions about the case, which involves thinking about it." (*Bormann*, at p. 263.) Although jurors must not "deliberate" until all 12 are together in the jury room, the *Bormann* court distinguished jury deliberation as the collective process and not the "the solitary ruminations of individual jurors." (*Ibid.*)

The court continued, "If Juror C.'s pondering the case outside the jury room was not misconduct, the remaining question is whether it was misconduct for her to prepare and then consult in the deliberations her out-of-court reduction of her thoughts to writing." (*Bormann, supra,* 56 Cal.App.4th at p. 263.) The court answered that question as follows: "The declarations showed that Juror C. prepared this writing as a recital of her impressions of the evidence, in order to assist her in orally communicating those ideas to the rest of the jury. To hold this to be misconduct would mean the same would be true of a few words on scratch paper, or a gummed reminder of a question, which a juror wished to raise in deliberations when they reconvened. But as long as such notations are the product of the juror's own thought processes and the evidence, rather than extraneous influences, their making or consultation does not exceed the boundaries of proper conduct." (*Id.* at p. 264, fn. omitted.)

The Court of Appeal concluded: "Appellant's position ultimately is that the integrity of jury deliberations requires that jurors not be permitted to think about the case except when assembled together, and that they refrain from introducing into deliberations ideas about the evidence developed outside one another's presence. This may or may not be a worthy ideal. But the Legislature has long resolved to permit jurors to recess and separate during deliberations, while strictly barring them from receiving outside evidence or influences. (See Code Civ. Proc., § 611.) These rules do not, as they cannot, prohibit jurors who have reached the stage of being entitled to form opinions about the case (*ibid.*) from individually contemplating the evidence and the outcome while separated. Moreover, the permissibility of jurors' recording ideas that they wish to share in deliberations is consistent with the requirement and promise that all jurors actively and fully participate in those

deliberations. [Citation.] Juror C.'s conduct in this case was not misconduct." (*Bormann, supra,* 56 Cal.App.4th at p. 265.)

Likewise here, because the jury was deliberating, there was nothing improper in Juror G.B.'s contemplating the case while separated from the other jurors. Like the juror's notes in *Bormann, supra,* 56 Cal.App.4th 260, G.B.'s diagram was "the product of the juror's own thought processes and the evidence, rather than extraneous influences." (*Id.* at p. 264.) The diagram was a visual representation of what the testimony and exhibits established, based on G.B.'s recollection and interpretation of the evidence. He drew the diagram to test his own view of the evidence, which allowed him to argue his position to the jury. Making the diagram did not exceed the boundaries of proper conduct.

Nor did Juror G.B.'s use of the computer to draw his diagram elevate his actions to misconduct. The computer did not create evidence that was not already before him. The variables of height, distance and angle were based on G.B.'s recollection of the evidence. The diagram contained no information beyond the record. The computer was simply the device that allowed G.B. to draw his diagram with ease and accuracy in order to visualize the evidence. There was no showing that the computer or its software performed any analytical function or provided any outside information. As the Court of Appeal observed, "While [G.B.] used the computer to draw the heights and distances to scale, the drawing was nothing more than he could have done on paper or the blackboard."

Nevertheless, we caution that a computer may be misused to *investigate* the evidence. (See, e.g., *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1466 [89 Cal.Rptr.3d 402] [juror's online search for definition of "great bodily injury" was misconduct]; *People v. Wadle* (Colo. 2004) 97 P.3d 932, 934 [juror's downloading of Internet description of Paxil, which she read to other jurors, was misconduct]; *Brown v. State* (2005) 275 Ga.App. 281 [620 S.E.2d 394, 397–398] [juror's use of MapQuest to determine distances was misconduct]; *Wardlaw v. State* (2009) 185 Md.App. 440 [971 A.2d 331, 338] [juror's Internet research of oppositional defiant disorder was "egregious misconduct"]; *People v. Lara* (N.Y.App.Div. 2007) 44 A.D.3d 488 [843 N.Y.S.2d 311] [juror's obtaining weather information from Internet was misconduct]; *Thompson v. Krantz* (2006) 2006 OKCIVAPP 60 [137 P.3d 693, 697–698] [juror's Internet research of myelogram procedures and plaintiff's medications was misconduct]; *State v. Boling* (2006) 131 Wn.App. 329 [127 P.3d 740, 741] [juror's Internet research of alcohol poisoning as cause of death was misconduct]; *U.S. v. Wheaton* (6th Cir. 2008) 517 F.3d 350, 358–362 [juror's

use of Internet mapping program to determine locations of and distances between cities was misconduct].)

If, for example, a juror conducts an investigation in which he or she relies on software that manipulates the data, subjecting it to presumptions written into the program, such use would likely constitute an improper experiment. The computer in such a circumstance is analogous to the use of the juror's binoculars in *Castro, supra,* 184 Cal.App.3d 849, or the juror's gun in *Conkling, supra,* 111 Cal. 616. As with the binoculars and the gun, the computer in these circumstances creates extraneous evidence not admitted at trial.

In sum, Juror G.B.'s computer use was part of his individual contemplation of the evidence after the matter had been submitted to the jury. (*Bormann, supra,* 56 Cal.App.4th at p. 265.) The jury's demonstration in the deliberation room was simply a "more critical examination" of the evidence admitted. (*Higgins, supra,* 159 Cal. at p. 659.) In neither situation did jurors receive extrinsic evidence. As a result, there was no basis for the trial court's conclusion that jurors committed misconduct, and thus no basis for granting a new penalty phase trial.[35]

### 7. *Remand to the Trial Court*

Defendant contends the case must be remanded to the trial judge for new review pursuant to section 190.4, subdivision (e). There is no basis for a remand.

---

[35] As noted, *ante,* the trial court also granted a new trial on two other grounds: (1) misconduct by the prosecutor in conveying the desire of the victim's family for the death penalty; and (2) the erroneous admission of other criminal activity during the testimony of Fred Joseph. The Court of Appeal did not consider either issue in reversing the trial court, stating that the trial court did not rely on those grounds in granting a new penalty trial.

Defendant's petition for review addressed only the Court of Appeal's ruling regarding jury misconduct. However, he has briefed the other two grounds relied on by the trial court and asks that we review them. (See Cal. Rules of Court, rule 8.516(b)(2) ["The court may decide an issue that is neither raised nor fairly included in the petition or answer if the case presents the issue and the court has given the parties reasonable notice and opportunity to brief and argue it."].) We decline to do so. The trial court, rather than defense counsel, raised the issues as a basis for a new trial motion. Neither defense counsel nor the prosecutor briefed those issues, despite the trial court's request that they do so. During the prosecutor's closing argument, defendant never objected to the portion of the argument relied on by the trial court in its order. During Joseph's testimony, defendant never objected to the reference to other crimes evidence nor did he ever request that the court strike the testimony on that particular ground. The record does not indicate that defendant sought rehearing in the Court of Appeal as to its ruling declining to address those two issues. (See Cal. Rules of Court, rule 8.268.) However, as alternatively requested by defendant, we considered the prosecutor's penalty phase argument as an independent claim of misconduct and considered the admission of Joseph's testimony as an independent claim of trial error.

Judge Leon Kaplan presided over defendant's trial. On several occasions during the trial, outside the presence of the jury, the prosecutor expressed her dissatisfaction with Judge Kaplan. She noted the judge frequently interposed his own objections and repeatedly asked for briefing on issues not raised by defendant. She questioned whether his personal feelings against the death penalty were interfering with his ability to be fair to the prosecution. After Judge Kaplan granted defendant's motion for a new penalty trial, the prosecutor argued that the ruling was erroneous, concluding with this remark: "I don't think anyone can doubt that what this court is doing is twisting and torturing out of all shape what has occurred in this case in order to reach this court's decision not to impose the death penalty on this defendant because of this court's personal belief." Judge Kaplan stated that he would not "respond to personal attacks on this court which have been ongoing and relentless." After he made additional comments explaining the basis for his ruling granting the new penalty trial, Judge Kaplan stated: "I have one last statement to make and that is that in light of the personal attacks against the court, I feel that justice would be best served if I would recuse myself from further hearings in this case. The People may wish to consider reassigning this case but that is something that is entirely and exclusively within their province. As for myself, I am going to recuse myself from presiding over further proceedings, however I do not recuse myself from availability to making any supplemental or additional findings that may be required by any reviewing court."

The case was reassigned to the supervising judge of the criminal courts. After the Court of Appeal reversed the trial court's grant of the new penalty trial, the matter was remanded and eventually reassigned to Judge Howard Schwab to rule on defendant's automatic motion for modification of the verdict under section 190.4, subdivision (e). At the time of this reassignment and again before Judge Schwab, defense counsel objected to having his motion heard by anyone other than Judge Kaplan.

Defendant contends that Judge Kaplan made a limited recusal, retaining his availability to make "any supplemental or additional findings that may be required by any reviewing court." Defendant claims that review under section 190.4, subdivision (e), is such a supplemental or additional finding.

Section 190.4, subdivision (e), provides that a judge ruling on an application for modification of a verdict of death shall "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." A motion under section 190.4, subdivision (e), should be considered by the same judge

who presided at trial whenever possible. (*People v. Brown* (1988) 45 Cal.3d 1247, 1264, fn. 7 [248 Cal.Rptr. 817, 756 P.2d 204].) However, we have recognized that when the trial judge dies or becomes unavailable before the modification motion has been decided, it may be heard and determined by any other judge of the same court. (*Ibid.*) We have reached the same conclusion with regard to cases remanded to the trial court for the limited purpose of redetermining the modification motion. (*People v. Espinoza* (1992) 3 Cal.4th 806, 830 [12 Cal.Rptr.2d 682, 838 P.2d 204]; *People v. Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892]; *People v. Sheldon* (1989) 48 Cal.3d 935, 963 [258 Cal.Rptr. 242, 771 P.2d 1330].)

In disqualifying himself, Judge Kaplan stated that "justice would be best served" by his recusal from further hearings. At the time of defendant's trial, Code of Civil Procedure former section 170.1, subdivision (a)(6)(A), provided that a judge is disqualified if "the judge believes his or her recusal would further the interests of justice . . . ."[36] Upon the determination of disqualification, the judge "shall not further participate in the proceeding, except as provided in Section 170.4, unless his or her disqualification is waived by the parties as provided in subdivision (b)." (Code Civ. Proc., § 170.3, subd. (a)(1).)

Defendant acknowledges that none of the exceptions in Code of Civil Procedure section 170.4, apply here.[37] Indeed, Judge Kaplan belatedly and correctly recognized that he could not engage in selective recusal. At a subsequent record correction proceeding, Judge Kaplan explained that upon further review he determined that he had no jurisdiction to conduct any activities not expressly authorized in Code of Civil Procedure section 170.4. Judge Kaplan cited *Geldermann, Inc. v. Bruner* (1991) 229 Cal.App.3d 662, 665 [280 Cal.Rptr. 264], in which the Court of Appeal determined that the judicial disqualification statutes (Code Civ. Proc., §§ 170–170.8) "do not permit limited, partial or conditional recusal."

Defendant nevertheless argues that the statutory limitations of Code of Civil Procedure section 170.4 cannot prevail in light of constitutional considerations underlying the "requirement" that the trial judge conduct the section 190.4, subdivision (e) review. Defendant contends that by depriving Judge Kaplan of this review, he was directly denied his constitutional rights to due

---

[36] Although Code of Civil Procedure section 170.1 has since been renumbered and amended, the current substantive provisions of subdivision (a)(6)(A)(i) are identical.

[37] Under Code of Civil Procedure section 170.4, subdivision (a), a disqualified judge may only: "(1) Take any action or issue any order necessary to maintain the jurisdiction of the court pending the assignment of a judge not disqualified. [¶] (2) Request any other judge agreed upon by the parties to sit and act in his or her place. [¶] (3) Hear and determine purely default matters. [¶] (4) Issue an order for possession prior to judgment in eminent domain proceedings. [¶] (5) Set proceedings for trial or hearing. [¶] (6) Conduct settlement conferences."

process and a fair and reliable penalty trial or deprived of a state-created liberty interest, thus derivatively denying him due process. (See *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 100 S.Ct. 2227].)

Defendant's assertions lack merit. Applicable statutory law disqualified Judge Kaplan from ruling on defendant's modification motion. A judge of the same court was authorized to rule on the motion. Contrary to defendant's assertion, section 190.4, subdivision (e) does not require that the motion be heard by the same judge who presided at trial. The statutory procedure merely creates a preference for the same judge to hear the motion if possible. (See *People v. Brown, supra,* 45 Cal.3d at p. 1264, fn. 7.) Judge Kaplan's self-recusal precluded his further participation. Thus, defendant cannot claim a protected liberty interest under the Fourteenth Amendment of the federal Constitution.

Finally, defendant asserts this matter should be treated in similar fashion to a mistrial intentionally caused by the prosecutor. (See *Oregon v. Kennedy* (1982) 456 U.S. 667, 676 [72 L.Ed.2d 416, 102 S.Ct. 2083] [double jeopardy may apply where the prosecutor's conduct is intended to "goad" the defendant into moving for a mistrial].) Defendant claims that Judge Kaplan's unavailability was provoked by the deliberate action of the prosecutor. He asserts that because the statutory requirements for the imposition of a death sentence cannot be fulfilled, a sentence of life without possibility of parole should be imposed.

Defendant's argument is mere speculation, and we reject it. Judge Kaplan did not elaborate on his decision to disqualify himself beyond noting that because of the "personal attacks" levied against him, "justice would be best served" by recusing himself from further hearings in the case. Although the prosecutor at times vociferously disagreed with Judge Kaplan's rulings, advocates are permitted to argue that the court's rulings are erroneous or unfair. The record does not establish that the prosecutor was attempting to "goad" the judge into disqualifying himself. If the prosecutor sought to preclude Judge Kaplan from presiding over the case, she could have moved at any time to disqualify him for cause pursuant to Code of Civil Procedure section 170.1. Moreover, Judge Kaplan had options short of recusing himself if the prosecutor was as deliberately provocative as defendant asserts. At no time during the trial did Judge Kaplan attempt to impose sanctions on the prosecutor. Nor did he find or threaten to find her in contempt.

### 8. *CALJIC No. 8.85*

Defendant argues that the reference in CALJIC No. 8.85 to "extreme" mental or emotional disturbance violated his right to have the jury consider

less severe mental disturbances in mitigation and thus is constitutionally infirm. We have previously repeatedly rejected this claim. (*People v. Bramit* (2009) 46 Cal.4th 1221, 1249 [96 Cal.Rptr.3d 574, 210 P.3d 1171]; *People v. Richardson* (2008) 43 Cal.4th 959, 1035 [77 Cal.Rptr.3d 163, 183 P.3d 1146]; *People v. Brown* (2004) 33 Cal.4th 382, 402 [15 Cal.Rptr.3d 624, 93 P.3d 244].)

### 9. *CALJIC No. 8.88*

Defendant challenges CALJIC No. 8.88 as unconstitutional on grounds that we have rejected in the past.[38] The phrase "so substantial" is not constitutionally vague. (*People v. Friend* (2009) 47 Cal.4th 1, 90 [97 Cal.Rptr.3d 1, 211 P.3d 520]; *People v. Salcido, supra,* 44 Cal.4th at p. 163.) The instruction is not unconstitutional in failing to inform the jury that death must be the appropriate penalty, not just the warranted penalty (*People v. Bramit, supra,* 46 Cal.4th at p. 1249); that a life without possibility of parole sentence may be imposed even if the aggravating circumstances outweigh those in mitigation (*Friend, supra,* at p. 90; *Bramit, supra,* at p. 1249; *People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 24); and that neither party bears the burden of persuasion (*Friend, supra,* at p. 90; *Bramit, supra,* at p. 1249; *People v. Harris, supra,* 43 Cal.4th at p. 1322).

### 10. *Challenges to California's Death Penalty Law*

We reject defendant's claims that California's death penalty statute is unconstitutional in a number of respects.

Section 190.3, factor (a), allowing the jury to consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1," does not violate the Fifth, Sixth, Eighth, or Fourteenth Amendment to the United States Constitution by allowing arbitrary imposition of the death penalty. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Loker* (2008) 44 Cal.4th 691, 755 [80 Cal.Rptr.3d 630, 188 P.3d 580]; *People v. Stevens* (2007) 41 Cal.4th 182, 211 [59 Cal.Rptr.3d 196, 158 P.3d 763].)

"The death penalty statute does not violate the Eighth and Fourteenth Amendments by failing to require the state to prove beyond a reasonable doubt that aggravating factors are true (except for other unadjudicated crimes), that aggravating factors outweigh mitigating factors, or that death is

---

[38] Defendant relies upon the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the California Constitution.

the appropriate sentence." (*People v. Loker, supra,* 44 Cal.4th at p. 755.) The United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738], and their progeny have not altered these conclusions. (*People v. Bunyard* (2009) 45 Cal.4th 836, 858 [89 Cal.Rptr.3d 264, 200 P.3d 879].)

It is settled that "the trial court need not and should not instruct the jury as to *any* burden of proof or persuasion at the penalty phase." (*People v. Blair* (2005) 36 Cal.4th 686, 753 [31 Cal.Rptr.3d 485, 115 P.3d 1145], italics added.) "The death penalty law is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1066 [47 Cal.Rptr.3d 467, 140 P.3d 775].)

The death penalty statute and instructions are not unconstitutional for failing to require juror unanimity on the aggravating factors. Written findings are not constitutionally required. (*People v. Loker, supra,* 44 Cal.4th at p. 755; *People v. Stevens, supra,* 41 Cal.4th at p. 212.)

"Intercase proportionality review is not constitutionally required. [Citation.] Nor does equal protection require that capital defendants be afforded the same sentence review afforded other felons under the determinate sentencing law." (*People v. Dunkle* (2005) 36 Cal.4th 861, 940 [32 Cal.Rptr.3d 23, 116 P.3d 494].)

"The death penalty does not violate the Eighth Amendment, international law, including article VII of the International Covenant of Civil and Political Rights, or 'evolving standards of decency.' " (*People v. Butler, supra,* 46 Cal.4th 847, 885.)

### 11. *Cumulative Error*

Defendant contends the cumulative effect of guilt and penalty phase errors at his trial requires reversal of his death sentence. Any errors or assumed errors were nonprejudicial, whether reviewed separately or cumulatively.

## III. DISPOSITION

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied August 11, 2010. George, C. J., did not participate therein.